IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN H. CASWELL,

          Petitioner,               No. CIV S-91-1079 FCD EFB P

     vs.

ARTHUR CALDERON,

          Respondent.            FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding through counsel with this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges the 1999 decision by the California Board of Parole Hearings (hereinafter "Board") to rescind his unexecuted 1986 grant of parole.  Upon careful consideration of the record and the applicable law, the undersigned finds that petitioner's application for habeas corpus relief must be granted.

FACTUAL AND PROCEDURAL BACKGROUND

**I.  State Court Proceedings**

        Caswell is serving an indeterminate life sentence with the possibility of parole, following his 1976 conviction of four counts of kidnapping for the purpose of robbery (Pen. Code, § 209); he was also convicted of four counts each of first degree robbery (Pen. Code, § 211), assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and attempted murder (Pen. Code, §§ 664, 187), as to which prison sentences were stayed.  The Board is the executive

1

agency authorized to grant parole and set release dates for prisoners serving life sentences, and in certain circumstances it may rescind an unexecuted grant of parole.  (Pen. Code, §§ 3040, 3041.)

## A. Caswell's Offenses

The 1978 appellate decision affirming Caswell's convictions summarizes the offenses as follows: "On the evening of May 20, 1976, at approximately 9:00 p.m., [the victims] college students Eanswythe Leicester, Jeremy Grainger, James McCabe and Laura Goldman were in the vicinity of Redding, California, on a camping trip.  The [victims] stopped at campsite 14 of the Antlers Campground to eat and go swimming.  On their way to the lake the [victims] met [the prisoner] Caswell and spoke with him briefly.  After finding that they could not reach the lake from their campsite, the [victims] crossed campsite 16 on their way back to the car, and there talked with both [Caswell and his crime partner, David Englund] who were occupying that campsite.  [¶]  The [victims] then returned to their car and left the campsite, and as they passed campsite 16 [Caswell and Englund] came out to the road and waved for them to stop.  [Caswell and Englund] asked for a ride out of the campground, then . . . Englund pointed a gun at the [victims] and ordered them out of the car.  The [victims] were ordered to the campsite 16 picnic benches as Englund pointed the gun at them and Caswell pushed them along, saying that Englund had 'a hole in his leg.'  Caswell drove the car into the campsite.  [¶]  [Caswell and Englund] demanded money from the [victims]; Jeremy and Laura gave their money to [Caswell and Englund] and James went to the car with Caswell and gave his money to him.  Eanswythe had left her money in her backpack in the car and she told [Caswell and Englund] she did not have money.  When [Caswell and Englund] wanted more money[,] Jeremy told them they were students and did not have much.  Englund struck him with the gun.  [Caswell and Englund] indicated that they were going to take the car, and again stated that Englund was wounded.  [¶]  [Caswell and Englund] attempted to tie the [victims] at the picnic bench, but then took them through the bushes to a meadow where they were forced to lie on the ground.  [Caswell and Englund] decided that the [victims] were too close to the road and might be able to shout for help, so they ordered them to get up and took them farther from the road.  [Either Caswell or Englund] stated that Jeremy's political T-shirt would make a good target.  The gun was fired, but no one was shot at that time.  [¶]  The victims were taken to a cliff and ordered to undress.  Eanswythe was then tied by the ankles with Jeremy's T-shirt, and Laura and Jeremy were tied together with rope [Caswell and Englund] had brought along.  [Caswell and Englund] tied Eanswythe's ankles to Laura and Jeremy using the same rope that Laura and Jeremy were tied with.  While tying the victims, Caswell indicated that he wanted to take sexual advantage of one of the girls, but Englund

2

was in a hurry and the matter was dropped.  When the victims were tied [Caswell and Englund] debated whether to shoot them, Englund arguing that they should and Caswell saying they should not.  [¶]  After tying three of the victims [Caswell and Englund] ran out of rope, and so they tied James' [ sic] legs with some clothing.  Englund struck James with the gun[,] and Caswell pushed him off the cliff.  [Caswell and Englund] shot at James and rolled rocks down at him until they believed he was dead.  Caswell attempted to push the others off the cliff but failed, due to the manner in which they had been bound.  The following discussion then took place:  'Englund: "Okay, let's just gag them."  Caswell: "Shoot them."  Englund:  "Okay."'  Englund then shot Laura in the stomach and Jeremy in the chest.  Eanswythe realized that it was her turn, and she held her hand in front of her face to prevent her glass lens from shattering into her eyes.  She was struck with the gun four or six times, and two shots were fired at her, one passing by her ear and the other striking her finger.  She then fell backwards.  [¶] [Caswell and Englund] ran back to the car and drove off."

**B. Board's Grant of Parole in 1986**

Caswell became eligible for release on parole in April 1983, but was denied a parole date on four occasions between May 1982 and March 1985, due at least in part to the seriousness of his offenses and, on most of these occasions, unfavorable psychiatric evaluations.

In March 1986, Caswell again appeared before the Board for parole consideration.  In addition to the summary of the offenses from the appellate decision, the 1986 panel had before it other material depicting the crimes, including transcripts of the 1982 and 1985 parole hearings.  Based on this information, it appeared the appellate court had attributed the statement, "Shoot them," to Caswell due to the testimony of one of the female victims.  The two male victims had testified that Caswell repeatedly disagreed with Englund's suggestion to shoot them.  According to the attorney who represented both Englund and Caswell at the 1985 hearing, Englund represented that Caswell had never suggested shooting the victims.[1]

The 1986 panel found Caswell suitable for parole, based on: his minimal criminal record and lack of significant history of violent crimes; his stable social history; his participation in education programs, self-help programs, and vocational programs while in

---

[1]  Caswell requested we take judicial notice of the first 11 pages of the transcript of the 1985 parole hearing that he inadvertently omitted from the record before the 1999 panel. We denied the request.

prison; his maturity and age; his parole plans, including job offers and family support; his positive institutional behavior; and favorable psychological evaluations. The panel stated: "Based on the information contained in the record and considered at this hearing, the panel states as required by [Penal Code section] 3043 that the prisoner would not pose an unreasonable threat to public safety if released on parole."

The 1986 panel calculated an aggregate term of sentence of 36 years, minus 41 months of postconviction credits, and set a parole release date in December 2006. Caswell's period of confinement was based on the four counts of kidnapping for the purpose of robbery. The panel set an aggravated term on two of these four counts, a middle term on another, and a mitigated term on the count pertaining to victim McCabe. The panel justified the mitigated term by pointing to the fact that, although Caswell pushed McCabe off a cliff and attempted to kill him, McCabe's injuries were minor. Caswell's term was later reduced, with a release date in September 2000.

The Board, sitting en banc, reviewed the grant of Caswell's parole release date in August 1998. Although this review was undertaken without a transcript of the 1986 hearing, the hearing at which a panel found the prisoner suitable for parole, the Board ordered that a parole rescission hearing be conducted to determine whether there was good cause to rescind Caswell's parole. Three reasons were identified for ordering the parole rescission hearing: (1) the extreme seriousness of the crime; (2) Caswell's minimization of his involvement in the commitment offenses; and (3) Caswell's lack of remorse.

**C. The Board's Rescission of Parole in 1999**

At the rescission hearing in March 1999, the panel relied exclusively on the transcript of the 1986 hearing and did not receive any new evidence. For example, the 1999 panel was not in possession of transcripts of the 1982 and 1985 hearings, which would have provided full descriptions of the crimes and Caswell's involvement, as well as Caswell's testimony on those points.

Following the hearing, the 1999 panel unanimously found good cause to rescind Caswell's parole, citing the extreme seriousness of the crimes and Caswell's minimization of his involvement. In particular, the 1999 panel concluded that: (1) "[A]n in depth discussion of the life crime was not conducted by the [1986] Panel and the prisoner clearly minimized his role in this horrific crime"; (2) "[t]he [1986] Panel never mention[ed]" the stayed convictions; (3) the [1986] Panel's mitigation of the term for McCabe "missed the point in that the prisoner acted alone in attempting to murder the victim by pushing him over a cliff" and then with Englund "pushed boulders down on him to further do harm to the victim";

4

(4) Caswell minimized the "sexual overtures" he made to one of the female victims; and (5) the [1986] Panel should have found aggravation in the fact that Caswell "played an integral part in the facilitation of these crimes which resulted in numerous attempts to murder the victims" rather than finding mitigation in the fact that Caswell "did not shoot the victims." The 1999 panel concluded, however, that Caswell displayed sufficient remorse.

The Board's appeals unit denied Caswell relief. He then filed a petition for writ of habeas corpus in Solano County Superior Court.

**D. The Trial Court's Grant of Caswell's Habeas Corpus Petition**

On December 21, 2000, the trial court granted Caswell's petition for writ of habeas corpus and ordered the Board to reinstate Caswell's parole and parole date. The court found: "[A] full and complete review of the record herein fails to reveal any evidence in support of the rescinding panel's conclusion that the grant of parole was improvidently given for failure to consider the seriousness of the crime or failure to consider the petitioner's minimization of his involvement in the crime."

The Board appealed, and the superior court granted a stay pending disposition of the appeal.

*In re Caswell*, 92 Cal.App.4th 1017, 1022-1026 (2001).

On appeal, the California Court of Appeal, in a published opinion, reversed the judgment of the Superior Court and upheld the Board's 1999 decision rescinding petitioner's grant of parole. *Id.* The appellate court explained its reasoning as follows:

**A. BACKGROUND**

The Board is vested with exclusive authority to decide whether a life prisoner is suitable for parole. (Pen. Code, § 3040; Cal. Code Regs., tit. 15, §§ 2265-2454; *In re Powell* (1988) 45 Cal.3d 894, 901 [248 Cal.Rptr. 431, 755 P.2d 881] (*Powell*).) One year before the prisoner's minimum eligible release date, a panel of the Board meets with the inmate and normally sets a parole release date. (Pen. Code, § 3041, subd. (a).) Parole must be denied, however, if the panel in its discretion determines that the prisoner would pose an unreasonable risk of danger to society if released, in light of the gravity of his current convicted offenses or the timing and gravity of his current or past convicted offenses. (Pen. Code, § 3041, subd. (b); Cal. Code Regs., tit. 15, §§ 2281, subd. (a), 2402.)

Even after parole is granted, the Board is authorized to rescind the grant of parole, if unexecuted, for good cause after a rescission hearing.  (*Powell, supra*, 45 Cal.3d at p. 901; Cal. Code Regs., tit. 15, § 2450; *see* Pen. Code, §§ 3040, 3063.)  "Cause" for rescission includes conduct enumerated in section 2451 of title 15 of the California Code of Regulations, which at the time of Caswell's rescission hearing included: (1) any disciplinary conduct subsequent to the grant of parole, (2) psychiatric deterioration of the prisoner, and (3) new information indicating parole should not occur, such as an inability to meet a special condition of parole, information significant to the original grant of parole being fraudulently withheld from the Board, or fundamental errors which resulted in the improvident grant of parole.  (*Powell, supra*, at p. 902.)[2]

Cause for rescission is not restricted to those matters enumerated in California Code of Regulations, title 15, section 2451.  (*In re Johnson* (1995) 35 Cal.App.4th 160, 168 [41 Cal.Rptr.2d 449] (*Johnson*); *In re Fain* (1976) 65 Cal.App.3d 376, 393-394 [135 Cal.Rptr. 543] (*Fain*).)  Because the Board is afforded great discretion in parole decisions, "cause" includes a determination by the Board that parole was improvidently granted under the circumstances appearing at the time of the grant of parole or at a later time.  (*Powell*, *supra*, 45 Cal.3d at p. 902; *Johnson, supra*, at p. 168; *Fain, supra*, at p. 394.)  Thus, it has been held, parole may be rescinded if the granting panel failed to adequately consider the gravity of the prisoner's convictions.  (*Johnson, supra*, at pp. 168-169.)

Of course, a rescission may not be upheld merely because the Board has mouthed words that have been held to constitute "cause" for rescission.  There must also be an adequate "*factual underpinning* for the Board's determination of cause."  (*Johnson, supra*, 35 Cal.App.4th at p. 169, italics added.)  In light of the Board's broad discretion in these matters, however, we review the sufficiency of this factual underpinning using an extremely deferential standard, requiring merely "some evidence" to justify the rescinding panel's determination.  (*Powell, supra*, 45 Cal.3d at pp. 902, 904-906.)  As our Supreme Court has explained:  "A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and

---

[2]  In 2000, Title 15, section 2451 of the California Code of Regulations was amended without substantive change, making the occurrence of "[f]undamental errors" a separate ground for convening a rescission hearing.  Under the current version, therefore, a rescission hearing (and rescission itself) may be based on (1) the prisoner's disciplinary conduct; (2) his psychiatric deterioration; (3) "[f]undamental errors" during the hearing at which parole was granted; or (4) new information indicating parole should not occur.  (Cal. Code Regs., tit. 15, § 2451, subds. (a)-(d).)

subject to review and withdrawal for cause by the [Board].  While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. . . .  [T]he [Board] must strike 'a balance between the interests of the inmate and of the public.'  [Citation.]  If it is to accomplish this delicate task, it must operate with broad discretion and not be 'subject to second-guessing upon review.'  [Citation.]" (*Powell, supra*, at p. 904; *Johnson, supra*, 35 Cal.App.4th at pp. 169-170.)

An example of the application of the "some evidence" standard was provided by our Supreme Court in *Powell*.  There, a life prisoner was granted release dates at parole consideration hearings held in 1977 and 1979.  After a subsequent counselor's report expressed doubt about the prisoner's suitability for parole, the board ordered a rescission hearing.  At the rescission hearing, the panel considered three psychological reports, all of which had been prepared after Powell had been given a release date.  Two of the reports favored the grant of parole, while one report favored the rescission of parole.  (*Powell, supra*, 45 Cal.3d at pp. 898-901.)  The panel decided to rescind the prisoner's parole release date, because (1) the report favoring rescission raised significant doubts about the prisoner's potential for violence, convincing the panel that he would pose a danger to others if released, and (2) the granting panel had committed fundamental error, by failing to consider the prisoner's prior escape attempt and gun smuggling incident and only perfunctorily considering another escape attempt.  (*Id.* at p. 901.)

After announcing the applicable standard of review, our Supreme Court ruled that "some evidence" supported the first ground for rescission (pertaining to the new psychological evaluation), since the evaluation on which the Board premised its rescission was based on the prisoner's complete medical and correctional history.  (*Powell, supra*, 45 Cal.3d at pp. 905-906.)  The court concluded: "In sum, while the evidence was unquestionably in conflict, the resolution of that conflict and the weight to be given the evidence was for the board.  [Citation.]  Since its determination had a factual basis, the board did not abuse its discretion in rescinding Powell's parole."  (*Id.* at p. 906.)

However, we point out that Powell did not decide whether there was a sufficient basis in fact for the rescinding panel's second ground for rescission – that the granting panel failed to adequately consider the gravity of the offenses.  (*Powell, supra*, 45 Cal.3d at p. 906, fn. 12 ["Accordingly, we need not consider the [Board's] finding that the 1977 and 1979 panels committed fundamental error resulting in the improvident granting of parole dates."].)  Powell therefore does not illustrate the application of the "some evidence" standard where, as here, the basis for the rescission was

not new evidence, but a purportedly inadequate consideration of evidence by the granting Board.

Circumstances more analogous to the matter at hand were addressed by Division Four of this court in *Johnson, supra*, 35 Cal.App.4th 160.  There, a prisoner convicted of two first degree murders was found suitable for parole in 1981.  The Board, sitting en banc, later ordered a rescission hearing, due to (among other things) a clinical evaluation warning that his potential for violence on parole was unpredictable, a prison disciplinary action for possession of contraband, and concerns expressed by the Governor regarding public safety and the gravity of the prisoner's crimes.  (*Id.* at pp. 163-164.)  After the hearing, the panel decided to rescind the prisoner's parole on two grounds, both of which were premised on its disagreement with the granting panel's assessment of the evidence: (1) failure to give "adequate weight" to the clinical evaluation report, which indicated that the prisoner's release would pose a danger to public safety; and (2) inadequate consideration of the gravity of his crimes.  (*Id.* at pp. 167-168.)

The appellate court ruled that a granting panel's failure to adequately consider the gravity of the crimes may constitute "cause" for rescission of a prisoner's parole release date.  Turning to the sufficiency of the factual underpinning for the two grounds, the court identified "some evidence" to support the Board's decision to rescind parole because, in effect, it was not unreasonable to do so.  (*Johnson, supra*, 35 Cal.App.4th at pp. 169-170.)  The court explained: "Reasonable minds could differ as to whether the granting panel of the Board in 1981 gave adequate consideration to the gravity of Johnson's offenses.  Reasonable minds could also differ as to whether Johnson's release would pose a danger to public safety and as to whether in that regard adequate consideration was given to the clinical evaluation report . . . .  Because the Board's discretion in parole matters is 'great,' "absolute," and "almost unlimited"' [citation], it is certainly broad enough to permit the Board to make the findings herein." (*Johnson, supra*, at p. 169.)

This language in *Johnson* should not be misconstrued.  *Johnson* could be read – incorrectly – to uphold the rescission of a parole release date merely because "reasonable minds could differ" as to the panel's determination of the prisoner's suitability for parole.  That is, as long as there had been "some evidence" before the granting panel that could have reasonably justified a finding of unsuitability, a subsequent panel would have carte blanche to rescind the parole, decades later, for no reason other than its conclusory disagreement with the granting panel's ultimate decision, or mere political aversion to the concept of parole in general.  Notwithstanding the nearly absolute discretion of the Board, we find this interpretation of the standard untenable, and not in line with what our Supreme Court had in mind when it

8

decided *Powell*.  Indeed, "some evidence" of unsuitability for parole would exist in virtually every parole hearing, exposing every grant of parole to a Board's subsequent change of heart or political whim.

In reviewing a rescission of parole based on the granting panel's failure to adequately consider the gravity of the offenses, the proper focus is on the findings and conclusions that were central to the original panel's ultimate decision to grant parole.  When these findings or conclusions cannot be reconciled with the evidence before the granting panel, or when the granting panel misstated facts or explicitly declined to consider information germane to the gravity of the crimes, it can fairly be said that reasonable minds could differ on whether the panel gave adequate consideration to the severity of the crimes.  In those instances, "some evidence" of the panel's failure to adequately consider the gravity of the prisoner's offense(s) would exist, thereby justifying rescission of the parole release date.  (Cf. Cal. Code Regs., tit. 15, § 2451, subd. (c) [rescission hearing (and rescission) warranted for "[f]undamental errors" by granting panel].)

We now proceed to review the 1999 panel's decision de novo to determine if it properly applied the *Powell* standard to the findings and conclusions that underlay the earlier decision to grant parole. (*See Powell, supra*, 45 Cal.3d at p. 905.)

### B. Evidence Supporting the 1999 Rescission of Parole

The record of the Board's actions might suggest to some readers that the 1999 panel had determined Caswell's fate before the hearing commenced.  The en banc recommendation that a rescission hearing be held – purportedly because the 1986 panel improvidently granted parole –  was made without benefit of a transcript of the 1986 hearing, and the rescinding panel did not have the 1982 and 1985 hearings' transcripts, at which the offenses and Caswell's participation were extensively discussed.  In light of Caswell's exemplary conduct throughout the period of his incarceration, one might question whether the determinations of either panel represented a predetermined conclusion in search of a justification, supported by little more than makeweight rationalizations for the rescission.  (*See generally In re Rosenkrantz* (2000) 80 Cal.App.4th 409 [95 Cal.Rptr.2d 279].)  Indeed, the statutory and administrative framework under which the Board operates invites debate over the role of political influence and public clamor in the parole review scheme.  (*See Warren, State Slams Door on Hopes for Parole Prisoners, L.A. Times* (Oct. 3, 1999) p. 1.)

Our task, however, is not to debate the predisposition of the panel or the political influences upon it, but to determine whether there is

an appropriate statement of "cause" for the rescission and "some evidence" to support the 1999 panel's conclusions.  The Board's grounds for rescission, which we have reorganized slightly to clarify our discussion, were the following: (1) the granting panel did not conduct an in-depth discussion of the life crime; (2) the granting panel did not mention the stayed convictions; (3) the granting panel should have found aggravation in the fact that Caswell "played an integral part in the facilitation of these crimes which resulted in numerous attempts to murder the victims" rather than finding mitigation in the fact that Caswell "did not shoot the victims"; (4) Caswell minimized his role in the life crime and the "sexual overtures" he made to one of the female victims; and (5) the granting panel's mitigation of the term for McCabe "missed the point in that the prisoner acted alone in attempting to murder the victim by pushing him over a cliff" and then with Englund "pushed boulders down on him to further do harm to the victim."

We accept the premise, not substantially disputed by the parties, that these grounds generally fall within the rubric of inadequate consideration of the gravity of Caswell's offenses, and thus there exists a sufficient statement of "cause" for the action taken by the rescinding panel.  (*Johnson, supra*, 35 Cal.App.4th at pp. 168-169.)  We next examine the factual underpinning for each of these grounds.  As we shall explain, the first four grounds lack sufficient factual support in the record and, as such, cannot justify rescission of the parole release date.  The fifth ground, however, properly addresses a determination by the granting panel, which was so at odds with the material before the granting panel that there is a sufficient factual basis to conclude the granting panel failed to adequately consider the gravity of Caswell's offenses.

**1. 1986 Panel's Discussion of Caswell's Life Crime**

The 1986 panel's discussion of Caswell's life crime was not so lacking as to constitute evidence of the panel's failure to consider the gravity of his offenses.  The granting panel appeared familiar with the facts and began its interrogation of Caswell with questions concerning his involvement in the crimes.  Unlike the 1999 panel, the 1986 panel also had transcripts of Caswell's 1982 and 1985 parole hearings, which contained thorough descriptions of the offenses.  In addition, the 1986 panel was provided a broad array of other material, including the transcript of the sentencing hearing at which the trial court commented on the seriousness of the offenses and a life prisoner evaluation discussing the aggravating circumstances of the commitment offense.  We may presume the panel considered the evidence before it.  (Evid. Code, § 664.)[3]

---

[3]  The rescinding panel's assertion that the 1986 panel failed to adequately consider the 1982 and 1985 hearing transcripts is somewhat ironic, since the 1999 panel did not even have transcripts of Caswell's 1982 or 1985 hearings when it passed judgment on the action taken by

In fact, the contention that the granting panel failed to sufficiently discuss Caswell's life crime appears to be derived solely from the rescinding panel's disagreement with the result of the 1986 hearing.  The rescinding panel did not support its contention with any erroneous specific factual determination by the granting panel that concerned the life crimes.  Nor did it cite to any express omission of evidence material to the earlier panel's consideration of those crimes.  Because the rescinding panel's subjective characterization of the granting panel's discussion of Caswell's life crimes fails to address any specific finding and lacks evidentiary support, it is an insufficient ground for rescinding Caswell's parole.

### 2. Failure to Mention Stayed Offenses

The 1999 panel also found that rescission was justified because the 1986 panel failed to mention Caswell's stayed offenses.  When Caswell was sentenced by the trial court, prison terms as to 12 of the 16 counts were stayed pursuant to Penal Code section 654:[4] four counts each of attempted murder, first degree robbery with intent to inflict great bodily injury (including special findings that the victims suffered great bodily injury), and assault with a deadly weapon and/or by means of force likely to produce great bodily injury.

The 1986 panel's failure to recite and discuss the stayed offenses is not evidence that parole was improvidently granted.  There is no requirement that the stayed offenses be recited or independently discussed.  Although the 1986 panel was obligated to consider the facts underlying these stayed offenses, since they were intertwined with the crimes for which Caswell was imprisoned (Cal. Code Regs., tit. 15, § 2326, subd. (b)), we can find no statement by the 1986 panel, or other affirmative evidence, suggesting the panel declined to take into consideration the entirety of Caswell's actions in its discussion of the commitment offenses.  To the contrary, the 1986 panel discussed with Caswell topics such as the tying up and shooting of the victims, his suggestion of sexual contact with one of the female victims, the pushing of McCabe over a cliff and the rolling of rocks onto him, as well as more general questions concerning the prisoner's participation in "all the acts."  We conclude that rescission cannot be justified on this ground.

---

the earlier panel.

[4]  Section 654, subdivision (a), reads: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

**3. Failure to Find Aggravation**

As a third ground for rescission, the 1999 panel declared that the granting panel should have found aggravation in Caswell's integral role in the facilitation of the crimes, which resulted in numerous attempts to murder the victims, rather than finding mitigation in the fact that Caswell did not shoot the victims.  The suggestion that the 1986 panel mitigated Caswell's crimes because he did not shoot anyone is inaccurate.  The 1986 panel did not state that it considered Caswell's actions less grave on this basis; and it did not reduce his term of confinement for that reason.   Instead, the remarks to which the 1999 panel refers appear in the closing comments of one of the 1986 panel members, as follows:  "*This was an exceptionally serious and aggravated commitment offense. In mitigation, you did not shoot the victims, and you have made tremendous progress while in the institution.*"  (Italics added.)  In context, the 1986 panel member was merely differentiating Caswell's actions from those of Englund, based on the uncontroverted fact that Caswell was not the one pulling the trigger.  The lone panel member's gratuitous comment does not provide a factual underpinning for the 1999 panel's determination that the granting panel failed to adequately consider the gravity of the commitment offenses.

**4. Caswell's Minimization of His Role in the Crimes.**

The 1999 panel also concluded rescission was appropriate because Caswell minimized his role in the crimes and his "sexual overtures" to one of the female victims.  In essence, at the 1986 hearing Caswell characterized his continuing participation in the crimes as an "inability" or "omission" in not escaping his crime partner.  He also attributed his suggestion of sexual contact with the bound, naked female victim, held at gunpoint, as "awkwardness," because he felt "uncomfortable tying those people up," he was "trying to impress [Englund]," and he "didn't want anybody to get shot."

Initially we point out that, contrary to appellant Board's implicit contention, a prisoner's refusal to admit participation in the crime on matters of conflicting evidence does not necessarily constitute unsuitability for parole or mandate rescission.  Section 2236 of title 15 of the California Code of Regulations reads: "The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability.  *The board shall not require an admission of guilt* to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against

////

the prisoner." (Italics added.)[5]  Nor does appellant provide any legal authority for the proposition that a prisoner's "minimization" of his involvement in the crimes is sufficient to warrant rescission where, as here, the prisoner has acknowledged responsibility and demonstrated remorse.

At any rate, the record does not uphold the panel's finding that Caswell minimized his involvement in the commission of the offenses.  In testifying that the crimes escalated because of his "inability to control" and his "omission to do anything to counter what [Englund] wanted [him] to do," Caswell took responsibility not only for what he actually did, but also for the escalation of the crime in his failure to act.  The transcript of the 1986 proceedings reveals that Caswell repeatedly admitted full responsibility for the entirety of the incident.  When asked whether he took "full responsibility for what happened," he responded:  "Yes, sir."  He was then asked, "Everything that you did prior to and after the life crime, you accept full responsibility for?"  Caswell responded, "Yes, sir."  Notwithstanding how one may view his excuses for suggesting sexual contact with one of the female victims, Caswell prefaced his explanation with an acknowledgement of its insufficiency, stating:  "And in no way, I don't want this panel to take this as a justification, because I don't believe there's any justification for my actions . . . ."  The 1999 panel's rescission order is not justified on the ground Caswell minimized his involvement in the crimes.

### 5. The McCabe Offense

Last, we turn to the two panels' views of Caswell's criminal conduct relative to victim McCabe.  The 1999 panel maintained that the granting panel misconstrued the gravity of this conduct and, as a result, improperly arrived at a mitigated term of imprisonment as to count VI, kidnapping for the purpose of robbery (Pen. Code, § 209), which identified McCabe as the victim.  In particular, the 1999 panel concluded the 1986 panel "missed the point" that Caswell acted alone in pushing McCabe off a cliff and rolling rocks down onto him, and inappropriately focused on the fact that McCabe suffered only minor injuries.  For reasons we shall explain, this ground for rescission reflects more than a mere disagreement with the ultimate determination reached by the 1986 panel.  Instead, it targets a specific conclusion of the

---

[5]  This is particularly relevant to the present case.  As Caswell's attorney pointed out at the 1999 hearing, the 1999 panel was to investigate whether the granting panel duly considered certain points or improvidently granted parole based on the material before it.  Further testimony from Caswell is not relevant to whether the granting panel made an appropriate consideration of the record.  Caswell himself explained that everything was a matter of record and he had nothing new to add.

granting panel and establishes the disparity between the conclusion and the evidence.

Before proceeding to our analysis, we dispose of a matter which, although not addressed by the parties at any length, warrants clarification. The granting panel's mention of the minor nature of McCabe's injuries was not explicitly brought up during the Board's assessment of Caswell's suitability for parole. Rather, discussion of McCabe's injuries, and the assignment of a mitigated term as to count VI, arose in connection with the granting panel's calculation of Caswell's release date. The granting panel's determination of the prisoner's suitability for parole and the calculation of a release date were made at the same hearing, by the same panel members, and based on the same evidence. The conclusion to be drawn is that the granting panel had the same evaluation of Caswell's conduct when deciding his suitability for parole as it did when calculating his release date.

The granting panel's assessment of Caswell's participation in the McCabe offense was a *specific finding*, which, in the context of the record before us, was central to its ultimate determination of the gravity of Caswell's offenses and his suitability for parole. Furthermore, the 1999 rescinding panel pointed to a factual basis in the record for concluding the granting panel's finding was inconsistent with the facts before it. The evidence before the granting panel was as follows: after tying McCabe up, Caswell pushed him off a cliff and proceeded to roll rocks onto McCabe until he believed McCabe was dead. The fact that McCabe suffered relatively minor injuries might be attributed to fortuity or an act of God, but it certainly cannot be attributed to Caswell. On this record, reasonable minds could differ on whether the granting panel gave adequate consideration to the gravity of Caswell's crimes. We are therefore constrained to agree there was "some evidence" this panel failed to adequately consider the gravity of Caswell's criminal acts against McCabe.[6] This ground alone justifies rescission of Caswell's unexecuted grant of parole, and the trial court erred in ruling to the contrary.

////

---

[6] As mentioned, ante, the 1999 panel did not obtain transcripts from the 1982 and 1985 parole hearings, which were before the granting panel. The 1999 panel sought to excuse this failure by expressing confidence in Caswell's attorney to bring to its attention salient information from these hearings. We reject the notion that a rescinding panel might be relieved, on that basis, from obtaining readily available information that had been considered by the granting panel. We point out, however, that nothing in the record suggests that the 1986 panel's finding concerning Caswell's criminal acts against McCabe turned on anything contained within the 1982 or 1985 transcripts. For this reason, the rescinding panel's failure to obtain transcripts of the two earlier hearings poses no impediment to upholding the rescission based upon the granting panel's view of Caswell's participation in the McCabe offense.

### III. Disposition

The judgment is reversed.

*In re Caswell*, 92 Cal.App.4th at 1026 -1035.[7]  Petitioner subsequently filed a Petition for Review in the California Supreme Court.  That petition was summarily denied by order dated January 15, 2002.  October 25, 2004 Answer, Ex. I.[8]

## II.  Proceedings in Federal Court

On August 12, 1991, petitioner, proceeding in pro per, filed his petition for a writ of habeas corpus in this court, in which he raised two claims.  First, he claimed that the trial court violated his right to due process by failing to give a proper jury instruction on aiding and abetting.  Second, he claimed that the 1986 Board violated the Ex Post Facto clause when it deferred his parole release date until 2000.  By order dated April 8, 1993, petitioner's jury instruction claim was dismissed.  This disposition was affirmed by the U.S. Court of Appeals for the Ninth Circuit in an order dated July 16, 1997.  On October 20, 1997, following the ruling by the Ninth Circuit, petitioner informed this court that he intended to proceed with his claim for relief based on the Board's alleged violation of the Ex Post Facto Clause.  While the parties were engaged in discovery on that claim, and as described above, petitioner filed his habeas petition in the California Superior Court challenging the Board's 1999 decision to rescind his 2000 parole release date.

---

[7]  In a subsequent order entitled "Order Modifying Opinion and Denying Rehearing; Supplemental Opinion upon Denial of Rehearing," Justice Stevens, who authored the published opinion, issued the following supplemental opinion:

> I would grant the petition for rehearing to consider further whether or not the granting panel's assessment of Caswell's participation in the McCabe offense was a specific finding as to Caswell's suitability for parole.

October 25, 2004 Answer, Ex. I.

[8]  Justices Baxter and Brown were of the opinion the petition should be granted.  Answer, Ex. I.

On January 15, 2002, petitioner, now proceeding through counsel, filed a motion for summary judgment on his ex post facto claim.  On February 6, 2002, petitioner filed a motion to amend his petition to add a claim that his rights to due process and equal protection were violated by the Board's 1999 rescission of his parole date.  Dckt. No. 124.  Respondent did not file a written response to petitioner's motion to amend.

In findings and recommendations dated April 23, 2002, the previously-assigned magistrate judge recommended that petitioner's request to amend his petition be denied because the claim he sought to raise was futile.  Dckt. No. 134 at 3.  The magistrate judge also recommended that petitioner's motion for summary judgment on his ex post facto claim be denied.  *Id.*  By order dated July 30, 2002, the district judge denied petitioner's motion for summary judgment on the grounds recommended by the magistrate judge.  He also denied the motion to amend, but on the sole ground of unexplained undue delay between the Board's 1999 rescission of petitioner's release date and petitioner's 2002 request for leave to amend.  Dckt. No. 136 at 9.  Judgment was entered on behalf of respondent on September 9, 2002.

Petitioner appealed the district court's decision to the Ninth Circuit Court of Appeals.  In a published opinion, the Ninth Circuit concluded that petitioner's Ex Post Facto claim was moot but ruled that petitioner should be granted leave to amend his habeas petition to add his due process challenge to the Board's 1999 decision rescinding his 2000 parole release date.  *Caswell v. Calderon*, 363 F.3d 832, 834 (9th Cir. 2004).  The court reasoned that petitioner's due process claim was not futile, petitioner did not delay in requesting leave to amend, and the claim was exhausted.  *Id.* at 839.  The court made the following comments relative to petitioner's due process claim:

> Second, based on the current record, we cannot conclude that Caswell's due process claim is futile due to lack of merit. Rescission of a prisoner's parole does not violate due process so long as "some evidence supports the decision." *McQuillion*, 306 F.3d at 904 (quoting *Superintendent v. Hill*, 472 U.S. 445, 456, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis in original)). That is not an exacting standard, so Caswell faces a difficult

challenge in attempting to establish that the Board's rescission of his parole release date violated due process. However, he is entitled to try. In 2001, the California Court of Appeal examined the rescinding panel's decision to revoke Caswell's parole. It began its analysis with this observation:

> The record of the Board's actions might suggest to some readers that the 1999 panel had determined Caswell's fate before the hearing commenced. The en banc recommendation that a rescission hearing be held-purportedly because the 1986 panel improvidently granted parole-was made without benefit of a transcript of the 1986 hearing, and the rescinding panel did not have the 1982 and 1985 hearings' transcripts, at which the offenses and Caswell's participation were extensively discussed. In light of Caswell's exemplary conduct throughout the period of his incarceration, one might question whether the determinations of either panel represented a pre-determined conclusion in search of a justification, supported by little more than makeweight rationalizations for the rescission.

*In re Caswell*, 92 Cal.App.4th at 1029-30, 112 Cal.Rptr.2d at 471. The Court of Appeal proceeded to reject as constitutionally deficient four of the five grounds the rescinding panel used to justify its decision. *Id.* at 1030-34, 112 Cal.Rptr.2d 462, 472-475.

Even as to the one ground relied on by the rescinding panel that the Court of Appeal did find was supported by "some evidence" – namely, that the granting panel's conclusion was at odds with the evidence at trial – the court noted that "reasonable minds could differ." *Id.* at 1034, 112 Cal.Rptr.2d 462, 475. Indeed, the Court of Appeal may have betrayed its own doubts about that finding by describing itself as "*constrained* to agree [with the rescinding panel that] there was 'some evidence' [that the granting] panel failed to adequately consider the gravity of Caswell's criminal acts against [one of the victims]." *Id.* at 1034-35, 112 Cal.Rptr.2d 462, 475 (emphasis added).

Caswell's argument that the rescinding panel did not base its decision on any evidence raises questions of fact that require examination of both the granting panel's and rescinding panel's decisions. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.1988) (holding that district court abused its discretion in denying leave to amend answer to include affirmative defense of settlement; proposed amendment was not futile because it raised "[q]uestions of fact"). Unfortunately, the rescinding panel's written decision is not in the district court file. This reinforces our conclusion that Caswell's due process claim cannot be deemed futile on its face.

1    *Id.*

2           On May 25, 2004, the previously-assigned magistrate judge ordered petitioner to file and

3    serve an amended petition consistent with the Ninth Circuit's opinion.  Dckt. No. 148.  On July

4    26, 2004, pursuant to that order, petitioner filed an amended petition for a writ of habeas corpus,

5    in which he raised the sole claim that the Board violated his right to due process when it

6    rescinded his 2000 parole date.  Respondent filed an answer on October 25, 2004, and petitioner

7    filed a traverse on December 30, 2004.

8           On December 18, 2009, this court set a status conference in order to address matters

9    concerning supplementation of the record before the court.  Subsequent to that conference, the

10   court issued an order requiring the parties to assemble and file a reconstructed record of all

11   documents potentially necessary to an adjudication of petitioner's due process claim.  The parties

12   were advised they could file objections to the court's consideration of any of the documents

13   contained in the reconstructed record in connection with its decision on petitioner's habeas

14   petition.

15          On May 28, 2010, the reconstructed record was received and filed by the court.  On June

16   7, 2010, petitioner's counsel filed an index to the reconstructed record.  The reconstructed record

17   consists of the following documents: (1) the transcript of petitioner's 1976 trial, consisting of

18   one volume of the Clerk's Transcript on Appeal and three volumes of the Reporter's Transcript

19   on Appeal; (2) the transcripts of petitioner's 1982, 1984, 1985, 1986 and 1999 parole suitability

20   hearings before the Board, including the written decisions thereon; (3) the "Lifer Packages"

21   submitted to the Board for use during petitioner's 1982, 1984, 1985, 1986 and 1999 parole

22   suitability hearings; (4) the December 21, 2000 opinion of the Solano County Superior Court

23   granting petitioner's application for a writ of habeas corpus; (5) a copy of *In re Caswell*, 92

24   Cal.App.4th 1017 (2001); (6) the unpublished 1978 opinion of the California Court of Appeal

25   upholding petitioner's judgment of conviction; and (7) respondent's Answer filed October 25,

26   2004, and all exhibits thereto.

On May 28, 2010, respondent filed a document entitled "Objections to Expansion of Record." Dckt. No. 171.  Therein, respondent argues that petitioner's due process claim is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter AEDPA) and that the scope of the records this court may consider is limited by that Act.  Specifically, respondent objects to this court's consideration of the opinion of the Solano County Superior Court granting petitioner's application for a writ of habeas corpus, and the transcripts of the 1982, 1984 and 1985 parole consideration hearings, on the grounds that those documents are irrelevant to the AEDPA standard of review on petitioner's due process claim.

DISCUSSION

**I.  Petitioner's Due Process Claim**

Petitioner claims that the Board's rescission of the 1986 finding that he was suitable for parole and the consequent elimination of his parole release date was "arbitrary and capricious" and "without cause or sufficient evidence," and therefore violated his federal right to due process.  Am. Pet. at 3, 5.  He argues that "[n]o reasonable comparison of the granting panel's decision and the rescinding panel's decision can support a determination that there was some evidence that the granting panel had not fully considered and weighed the circumstances of the crime, including the circumstances relating to the McCabe offense that the rescinding panel relied on and that the California Court of Appeal focused on as the basis for reversing the grant of habeas corpus."  *Id.* at 3-4.  Petitioner requests that this court "direct the Department of Corrections to reinstate his parole suitability finding, and to release petitioner on parole forthwith."  *Id.* at 6.

**II.  Standard of Review on Petitioner's Due Process Claim**

The parties dispute the proper standard of review in this case.  Respondent argues that petitioner's claim is subject to the AEDPA and must be analyzed pursuant to the deferential standard set forth therein.  Petitioner contends that the AEDPA does not apply to his claim because the claim is part of his habeas petition filed before AEDPA's effective date.

The Antiterrorism and Effective Death Penalty Act provides that a writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).  An application for a writ of habeas corpus filed after April 24, 1996, the effective date of AEDPA, is governed by the AEDPA standards of review.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  An application filed before the effective date of AEDPA is not subject to the AEDPA standard of review and must be reviewed by pre-AEDPA standards.  *Id.*

Petitioner filed his original habeas petition in this court in 1991, prior to the enactment of AEDPA.  In 2002, subsequent to the enactment of the AEDPA, petitioner sought to amend his 1991 petition to add his due process challenge to the rescission of his parole date.  Dckt. No. 124.  That request was ultimately granted by the Ninth Circuit Court of Appeals, and petitioner filed an amended petition on July 26, 2004.  Because petitioner filed his original petition prior to the effective date of AEDPA, substantive review of the 2004 amended petition is governed by pre-AEDPA standards and precedent.  *Lindh*, 521 U.S. at 327.  An amended petition filed after AEDPA's effective date is not subject to AEDPA's standards of review as long as the amendment is part of a case that was pending at the time AEDPA was enacted.  *See, e.g., Smith v. Mahoney*, 611 F.3d  978, 994-95 (9th Cir. 2010) (an amended petition filed after AEDPA was enacted containing new claims is not subject to AEDPA's statute of limitations as long as the amendment is part of a case pending at the time AEDPA was enacted); *Allen v. Roe*, 305 F.3d

1046, 1049-50 (9th Cir. 2002) (holding that because petitioner filed his original habeas petition

before the enactment of AEDPA, his amended petition filed after AEDPA's effective date was

governed by pre-AEDPA law); *Mancuso v. Olivarez*, 292 F.3d 939, 949 (9th Cir. 2002) (holding

under *Lindh* that review of amended petition filed after AEDPA's effective date was governed

by pre-AEDPA standards and precedent because Mancuso filed his petition prior to the effective

date of AEDPA); *Anthony v. Cambra*, 236 F.3d 568, 576-77 (9th Cir. 2000) (same).

Accordingly, this court will evaluate the merits of petitioner's due process claim under

pre-AEDPA standards.  Because the court is not constrained by AEDPA, the undersigned will

consider all of the records contained in the reconstructed record that are relevant to petitioner's

due process claim.[9]

**III.  Relevant Legal Standards**

 **A.  Non-AEDPA Standards of Review Applicable to Habeas Corpus Claims**

  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some

transgression of federal law binding on the state courts.  *See Peltier v. Wright*, 15 F.3d 860, 861

(9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*,

456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation

or application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v.

California*, 202 F.3d 1146, 1149 (9th Cir. 2000); *Middleton*, 768 F.2d at 1085.  However, a claim

of error based upon a right not specifically guaranteed by the Constitution may nonetheless form

a ground for federal habeas corpus relief where its impact so infects the entire trial that the

resulting conviction violates the defendant's right to due process.  *Lisenba v. California*, 314

U.S. 219, 236 (1941); *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980).  In order to raise such a

claim in a federal habeas corpus petition, the alleged error must have resulted in a complete

miscarriage of justice.  *Hill v. United States*, 368 U.S. 424, 428 (1962); *Crisafi v. Oliver*, 396

_____

 [9]  Regardless of AEDPA's inapplicability here, this court's review of the record is, as
discussed below, deferential.

F.2d 293, 294-95 (9th Cir. 1968).  Habeas corpus cannot be utilized to try state issues *de novo*.  *Milton v. Wainwright*, 407 U.S. 371, 377 (1972).  In reviewing a petition for writ of habeas corpus, a federal court must determine whether the state court's findings of fact are fairly supported by the record as a whole, and must make an independent review of the record to make this determination.  If the findings of the state court are fairly supported by the record, they are presumed correct.  28 U.S.C. § 2254(d)(8) (1996); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

## B.  Due Process in the Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A litigant alleging a due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or from "an expectation or interest created by state laws or policies."  *Wilkinson v. Austin* 545 U.S. 209, 221 (2005) (citations omitted).  *See also Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest."  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 12 (1979)).  "California's parole scheme gives rise to a cognizable liberty interest in release on parole."  *Pirtle v. California Bd. of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010) (quoting *McQuillion*, 306 F.3d at 902).  This liberty interest is

1    enforceable under the federal Due Process Clause.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th

2    Cir. 2010) (a state parole system that gives rise to a liberty interest in parole release is

3    enforceable under the federal Due Process Clause); *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.

4    2010) (denial of parole to a California prisoner "in the absence of 'some evidence' of current

5    dangerousness . . . violat[es] . . . his federal right to due process.")

6            In the context of parole proceedings, the "full panoply of rights" afforded to criminal

7    defendants is not "constitutionally mandated" under the federal Due Process Clause.  *Jancsek v.*

8    *Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987) (internal quotations and citation

9    omitted).  The United States Supreme Court has held that due process is satisfied in the context

10   of a hearing to set a parole date where a prisoner is afforded notice of the hearing, an opportunity

11   to be heard and, if parole is denied, a statement of the reasons for the denial.  *Hayward v.*

12   *Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (quoting *Greenholtz*, 442 U.S. at 16).  *See also*

13   *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases

14   involving parole issues).  In California, a prisoner is entitled to release on parole unless there is

15   "some evidence" of current dangerousness.  *Hayward*, 603 F.3d at 562; *Cooke*, 606 F.3d at 1213;

16   *Pirtle*, 611 F.3d at 1020 (parole habeas decided under *de novo* review); *In re Lawrence*, 44

17   Cal.4th 1181, 1210 (2008); *In re Rosenkrantz*, 29 Cal.4th 616, 651-53 (2002).  This requirement

18   of "some evidence" is a component of the liberty interest created by California's parole system

19   and is therefore enforceable under the federal Due Process Clause.  *Cooke*, 606 F.3d at 1213;

20   *Pearson*, 606 F.3d at 610-11.

21           **C.  California's Statutes and Regulations on Parole**

22           California law regarding rescission of unexecuted grants of parole was explained by the

23   California Court of Appeal in *In re Caswell*, 92 Cal.App.4th at 1026-1029, and has been set forth

24   above.  California law with respect to the decision to grant or deny parole is as follows.

25           In California, the setting of a parole date for a state prisoner is conditioned on a finding

26   of suitability.  Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  When a federal

court assesses whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis "is shaped by the state regulatory, statutory, and constitutional law that governs parole suitability determinations in California. *Pirtle*, 611 F.3d at 1020. The state regulation that governs parole suitability findings for life prisoners states as follows with regard to the statutory requirement of California Penal Code § 3041(b):

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2281(a). In California, the overriding concern in determining parole suitability is public safety. *In re Dannenberg*, 34 Cal. 4th 1061, 1086 (2005). This "core determination of 'public safety' . . . involves an assessment of an inmates *current* dangerousness." *In re Lawrence*, 44 Cal.4th at 1205 (emphasis in original). Accordingly,

> when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.

*Id.* at 1212 (citing *In re Rosenkrantz*, 29 Cal. 4th at 658; *In re Dannenberg*, 34 Cal. 4th at 1071; and *In re Lee*, 143 Cal.App.4th 1400, 1408 (2006)). "In short, 'some evidence' of future dangerousness is indeed a state *sine qua non* for denial of parole in California." *Pirtle*, 611 F.3d at 1021 (quoting *Hayward*, 603 F.3d at 562).

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but [] become eligible for parole consideration after serving minimum terms of confinement." *In re Dannenberg*, 34 Cal.4th at 1078. The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." *In re Lawrence*, 44 Cal.4th at 1202 (citing Cal. Penal Code § 3041(a)). A release date must be set "unless [the Board] determines that the gravity of the

current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal. Penal Code § 3041(b).  In determining whether an inmate is suitable for parole, the Board must consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs. tit. 15, § 2281(b).

The regulation identifies circumstances that tend to show suitability or unsuitability for release.  *Id.*, § 2281(c) & (d).  The following circumstances are identified as tending to show that a prisoner is suitable for release:  the prisoner has no juvenile record of assaulting others or committing crimes with a potential of personal harm to victims; the prisoner has experienced reasonably stable relationships with others; the prisoner has performed acts that tend to indicate the presence of remorse or has given indications that he understands the nature and magnitude of his offense; the prisoner committed his crime as the result of significant stress in his life; the prisoner's criminal behavior resulted from having been victimized by battered women syndrome; the prisoner lacks a significant history of violent crime; the prisoner's present age reduces the probability of recidivism; the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; institutional activities indicate an enhanced ability to function within the law upon release.  *Id.*, § 2281(d).

The following circumstances are identified as tending to indicate unsuitability for release: the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; the prisoner had a previous record of violence; the prisoner has an unstable social history; the

25

prisoner's crime was a sadistic sexual offense; the prisoner had a lengthy history of severe mental problems related to the offense; the prisoner has engaged in serious misconduct in prison. *Id.*, § 2281(c).  Factors to consider in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or cruel manner include:  multiple victims were attacked, injured, or killed in the same or separate incidents; the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; the victim was abused, defiled or mutilated during or after the offense; the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable or very trivial in relation to the offense.  *Id.*, § 2281(c)(1)(A) - (E).

In the end, under state law as recently clarified by the California Supreme Court,

> the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes.  (*Dannenberg, supra*, 34 Cal. 4th at pp 1083-84 [parallel citations omitted].)  Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense.  Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.  This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [citations omitted].

*In re Lawrence*, 44 Cal.4th at 1221.

## IV.  Analysis

Pursuant to relevant California law and the federal constitutional requirements of due process, this court must determine whether the record contains "some evidence" with sufficient "factual underpinning" supporting the Board's 1999 decision to rescind petitioner's parole date. *See Pirtle*, 611 F.3d at 1021; *In re Caswell*, 92 Cal.App.4th at 1027.

////

////

**A.  Background**

As described above, the 1999 Board panel found that the 1986 panel improperly found petitioner suitable for parole because:

> (1) the granting panel did not conduct an in-depth discussion of the life crime; (2) the granting panel did not mention the stayed convictions; (3) the granting panel should have found aggravation in the fact that Caswell "played an integral part in the facilitation of these crimes which resulted in numerous attempts to murder the victims" rather than finding mitigation in the fact that Caswell "did not shoot the victims"; (4) Caswell minimized his role in the life crime and the "sexual overtures" he made to one of the female victims; and (5) the granting panel's mitigation of the term for McCabe "missed the point in that the prisoner acted alone in attempting to murder the victim by pushing him over a cliff" and then with Englund "pushed boulders down on him to further do harm to the victim."

*In re Caswell*, 92 Cal.App.4th at 1030.  The California Court of Appeal found that the first four grounds lacked sufficient factual support in the record and could not justify rescission of petitioner's parole release date.  *Id.*  After conducting its own review of the record, and for the reasons expressed by the California Court of Appeal, this court agrees.  Accordingly, the court will address the fifth reason involving victim McCabe.

In its decision granting petitioner's habeas petition, the California Superior Court discussed at length the granting panel's methodical analysis of the parole sentence matrix as to each count and pointed out that it was only by quoting out of context a comment from that analysis that the rescinding panel concluded that the former panel minimized the seriousness of the offense with respect to victim McCabe.  As discussed by the Superior Court, when the granting panel's analysis is carefully considered in its entirety there is little, if any, support for the assertion that it minimized this offense.  The Superior Court found as follows:

> The respondent also argues that words by Commissioner Tong, found on the Granting Panel Transcript, at page 62, are proof of the granting panel's minimization and lack of exploration of the seriousness of the crime.  It is true that the commissioner states that "the victim was pushed off a cliff, but the injuries he received were lacerations that were not of a serious nature", however this statement must not be read out of context.  The commissioner is

27

setting forth the parole sentence matrix, analyzing each count and assessing the correct punishment for each.  The evidence shows that the granting panel determined that the victim of count 14 "received major injuries, receiving extensive treatment and movement was of a short time duration" and thereafter a 192 month base term was assessed.  (GPT, page 60)

The granting panel then stated that 'this is aggravated and above range, and the reasons supporting the decision are the crime involved factors in the higher matrix category in that there were numerous victims who moved from campsite to a meadow, then the cliff.  The victim was vulnerable from having been forced to disrobe after the robbery, and the victim suffered a serious stomach wound requiring extensive treatments, since the gunshot severed awn [sic] artery, causing massive bleeding."  (GPT, page 61)  Then the panel continues to address the additional sentenced life crimes, assessing 96 months for count 10 "the reason being, besides the movement from location to location within the camp grounds area, the victim was shot in the chest, suffering significant liver and abdominal injuries."  It is then that the panel addresses count 6, assessing an additional 60 months, less than for the other two victims, because "the panel notes that this is a mitigated term and note the reason that the victim was pushed off of the cliff but the injuries he received were lacerations that were not of a serious nature".  (GPT, page 62)

Read in its totality and within the context of the matrix analysis, this statement on page 62 of the Granting Panel Transcript, is not evidence that the panel missed the point regarding the seriousness of the crime or did not consider the petitioner to have played an integral part in the commission of the crime.  Rather, this is evidence of the panel weighing and balancing the facts of each of the counts in relations to each other in assessing the sentence to be imposed.  The fact that the victim who was shoved off of the cliff ultimately suffered injuries which were less severe than the other victims is not proof that the granting panel minimized the seriousness of the crime.  Finally, the rescinding panel had no quarrel with the matrix analysis and actual time set by the granting panel.  (RPT, pages 23-24)

Reconstructed Record, Parole Proceedings (hereinafter RR), at 872-73.

At petitioner's trial, James McCabe described what happened to him when he was pushed off the cliff:

A.  Then they decided they didn't have enough rope to tie me up, so apparently there wasn't enough.  So they decided to tie my legs with Jeremy's pants.

////

28

They tied me up separately from the other three, and then they decided to push me over the edge of the cliff.  We were about three or four feet from the edge.  So one reached his arms under my armpits.

Q.  Do you know which one?

A.  I wasn't sure which one.  And I looked down and I saw his two hands like this.

Q.  Was the gun in either hand?

A.  No gun in either hand.  And he lifted me up and kind of edged me toward the edge of the cliff.  And my legs were tied but nothing else was tied.  So I was hopping along to the edge of the cliff.  And he pushed me forward over the cliff.

Q.  And what happened then?

A.  Then, well, where I was pushed over there was a lot of brush and bushes and also rocks which jutted out from the cliff.  So I never fell and hit the ground.  I kind of fell through brush and through rocks.

I landed where there was a bunch of rocks which jutted out.  And I stayed down there.  There was a big hole surrounded by rocks.  I heard one or both of them say, "We're going to roll boulders down on top of you."  And I didn't see any boulders come down, but I heard a lot of brush breaking, so I bent down and felt them go over my back.  So then I got further down inside the hole that was there protected by the rocks, and I didn't hear anything after that, at least not right then.

Reconstructed Record, Trial Record, Reporter's Transcript, vol. I (hereinafter RT), at 1-212, 114-15.

Jeremy Granger gave the following testimony with respect to the actions of petitioner and Englund against Mr. McCabe:

A.  They had run out of rope and Jim was not tied at all.  They decided that they were going to throw him over the cliff.

Q.  And what specifically did you observe in that regard?

A.  They grabbed him rather roughly from behind, I think about his shoulders, though I can't be sure, and the next thing I know, the next thing I knew, he was over the cliff.  They had pushed him over the cliff.

> A.  Would you describe what you recollect seeing or hearing from
> that point on?
>
> Q.  They were afraid that he was still alive, or still conscious and
> that he was going to escape, and they shot down toward him.  I
> heard the gunshot.

*Id.* at 160-61.  Later, Granger testified that both Caswell and Englund pushed McCabe over the cliff.  *Id.* at 178.  Grainger also testified that after McCabe was pushed off the cliff, petitioner said "he's getting away," or "he's going to get away," and Englund responded by shooting down the cliff toward McCabe.  *Id.* at 180.

Eanswythe Leicester testified that "they threw Jim (McCabe) off the cliff."  *Id.* at 48. She "didn't really see who was doing the pushing."  *Id.*  She also testified that "they said he was getting away or something, so they fired a shot after him and rolled some rocks down.  And then they said, 'He's dead.  He's gone.'"  *Id.*  At that point, petitioner tried to push the other three off the cliff, but was unable to do so because of the way they were tied up.  *Id.* at 48-49.

Laura Goldman testified that Mr. McCabe was pushed off the cliff, but she did not see who pushed him.  *Id.* at 203.

At petitioner's initial parole consideration hearing conducted on May 20, 1982, and also at the subsequent hearings conducted in 1984, 1985 and 1986, the Panel incorporated into the record the statement of facts contained on pages 4-10 of the unpublished 1978 opinion of the California Court of Appeal affirming petitioner's judgment of conviction.  RR at 16-31, 140, 203-04, 307, 1009-17, 1024-33, 1039-47, 1055-64, 1070-78.  The first two and a half pages of this statement of facts were also recited by the California Court of Appeal in its 2001 published decision affirming the rescission of petitioner's grant of parole, and is contained in these findings and recommendations in the section entitled "Caswell's Offenses."[10]

---

[10]  The remaining pages concern the search for and subsequent apprehension and arrest of petitioner and his co-defendant and are irrelevant to the instant proceedings, with the exception of the factual statement that "James [McCabe] suffered lacerations which required stitches."  *Id.* at 894.

1     At the 1982 suitability hearing, petitioner's counsel read that part of the trial record

2   where Mr. McCabe testified as to what happened when he was pushed by petitioner down the

3   hill.  *Id.* at 41-42.  Petitioner admitted at the hearing that he pushed Mr. McCabe over the cliff.

4   *Id.* at 47.  He stated that his co-defendant then "kicked a boulder" down at McCabe.  *Id.* at 51-52.

5   Petitioner denied that he ever suggested shooting the victims.  *Id.* at 52.  Petitioner responded in

6   the affirmative when he was asked by a Board member whether he "did throw one of the victims

7   over the cliff, not knowing how far the cliff, or what kind, how far he was going to go over."  *Id.*

8   at 54.  Petitioner also stated that when he pushed Mr. McCabe off the cliff, he did not know

9   "what was below."  *Id.* at 51.  Petitioner explained that the victims stated they intended to walk

10  down to the lake from where they were, but petitioner told them it was too dark and they should

11  drive down.  *Id.* at 60.  When petitioner next saw the victims, they agreed that "if we went down

12  there, we wouldn't be able to get back up."  *Id.* at 61.  Later in the hearing, petitioner made the

13  following statements with regard to the offense against Mr. McCabe:

14          When it happened, it was like I was standing behind him and when
            I picked him up, his feet were tied and I stood him up and he just
15          went on over.  It was like his height, the length of his body, when
            he stood up and went on over . . . when I pushed him that way, he
16          just went on over the embankment.

17  *Id.* at 109.  Petitioner was found unsuitable for parole at this hearing.

18          At the parole suitability hearing conducted on August 8, 1984, the Board incorporated by

19  reference all of the facts concerning the crime of conviction that had been brought out at the

20  1982 hearing, including the facts contained in the opinion of the California Court of Appeal and

21  all additional facts discussed during the 1982 hearing.  *Id.* at 139-41.  Petitioner declined to

22  discuss the life crime at the 1984 hearing.  *Id.* at 141-42.  Petitioner was found unsuitable for

23  parole at this hearing in part because of the nature of the crime, including the fact that petitioner

24  "pushed one victim off the cliff and rolled rocks down at the victim until he believed the victim

25  was dead."  *Id.* at 186.

26  ////

1     At the 1985 parole suitability hearing, the panel members incorporated by reference the

2  facts elicited at the 1982 and 1984 hearings.  *Id.* at 203-05.  The factual record was corrected to

3  reflect that petitioner did not say "shoot them" with reference to the victims; that statement came

4  from co-defendant Englund.  *Id.* at 204.  Presiding Board member Juaregui stated that one of the

5  victims was pushed off a cliff, "shots were taken at him," "rocks were rolled down to him," and

6  both petitioner and his crime partner "believed that he was dead."  *Id.* at 206.  Petitioner stated,

7  "I – pushed Mr. McCabe over the cliff."  *Id.* at 211.  He stated that his actions were voluntary "in

8  the sense that – I didn't feel I had any other alternative."  *Id.* at 212.  Petitioner stated that he did

9  not "roll the rock down on the victim."  *Id.* at 214.  Petitioner explained that he had to assume

10  the same responsibility for what happened as his crime partner because, while the crime partner

11  may have instigated the violence, petitioner "put [himself] there" and "went along" with what

12  happened.  *Id.* at 214-15.  With respect to the offense against Mr. McCabe, the following

13  colloquy occurred:

14             MR. BRADY:  Why was Mr. McCabe rolled off the cliff?  Thrown
              off the cliff?

15

16             INMATE CASWELL:  Well – the conversation regarding shooting
              the victims – had arose four times – I think four times.  Prior to
              them being shot.

17

18             And – once on the way to the cliff area – Englund – made this
              statement about one of their t-shirts, they had some kind of logo on
              their t-shirt, and said that'd make a good target, and then fired a

19             shot.

20             PRESIDING MEMBER JUAREGUI:  And missed.  On purpose.

21             INMATE CASWELL:  I  – I believe he fired it in the air.

22             PRESIDING MEMBER JUAREGUI:  Okay.

23             INMATE CASWELL;  Yeah.

24             And – at the – the cliff area itself, I think it was mentioned two or
              three times.  And at all times I said no, don't shoot 'em, don't

25             shoot 'em.

26             They don't  – don't shoot 'em.

And – when I finished tying them up, I was at Mr. McCabe – because they were – they were lined up.

And – I felt that it was imminent that they were going to be shot. And Mr. McCabe – I was standing there – at Mr. McCabe's head – and his feet were pointing – towards the cliff.

And I picked him up and said, "I said: do you want to get shot or go off the cliff?"

And I pushed him over the cliff.

And then it, and then it wasn't but a split second after that – that – Englund came around, kicked a rock over the side.

Now I don't quite recall – if he shot down at him or not.

PRESIDING MEMBER JUAREGUI:  The victim claims he was shot at twice.

INMATE CASWELL:  Or – if that's when Englund shot the first person.  Because after that happened, that's when I turned my back.

PRESIDING MEMBER JUAREGUI:  Now – let me stop you there.

Who tried to push the other two off the cliff?

INMATE CASWELL:  I believe I did.  I tried to pick 'em up – before that, because he kept saying, "I'm gonna shoot 'em, I'm gonna shoot 'em."

And he was pulling the handle back on the gun and he – it was a – a – a – single-action.

And – I guess that's – you pull the hammer back and then you can release it or something – and he said, "I'm gonna shoot 'em, I'm gonna shoot 'em," and I felt – that they were gonna be shot.

And I didn't want anybody to get shot.

PRESIDING MEMBER JUAREGUI:  So you think that you – that you tried to push the two off the cliff – the record indicates they were too heavy and they couldn't be pushed off the cliff.

INMATE CASWELL:  I couldn't push them off the cliff.

They were, there were three people that were more or less tied together.

PRESIDING MEMBER JUAREGUI:  So you're saying that you think you tried to push them off or you know you tried –

INMATE CASWELL:  I know I tried to push them off, yes.

PRESIDING MEMBER JUAREGUI:  And then you did push the one fellow over.

INMATE CASWELL:  Because he was tied separately, yes.

PRESIDING MEMBER JUAREGUI:  Okay.

Mister –

MR. BRADY:  What did you think was going to happen to Mr. McCabe when he went over the cliff?

INMATE CASWELL:  Well, – uh – to be honest, I didn't – really – know; although I had been down that cliff area – three times – prior to this.  'Cause we'd been in this campground for a couple days anyway.

And I knew the – the basic terrain.  You know?  And we're talking – the embankment to Lake Shasta; we're not talking a sheer dropoff – although it is sheer – we're talking – an incline – not just – you know, straight up and down.

And I knew the basic terrain of that whole area.

PRESIDING MEMBER JUAREGUI:  How many feet to the bottom?

INMATE CASWELL:  Mm – probably a hundred; the lake goes down about a hundred feet.

PRESIDING MEMBER JUAREGUI:  Okay.

INMATE CASWELL:  And this was during the drought.

BOARD MEMBER CARTER:  That's about a three-story building?

PRESIDING MEMBER JUAREGUI:  Yeah.

BOARD MEMBER CARTER:  Something like that?

PRESIDING MEMBER JUAREGUI:  Yeah.

Mr. Brady?

////

34

1    MR. BRADY:  Yes.

2    Could the prisoner tell us –

3    BOARD MEMBER CARTER:  Four-story building.

4 *Id.* at 220-24.

5    Petitioner was found unsuitable for parole at this hearing based, in part, on the

6 circumstances of the crime, including the fact that "another of the victims was pushed off the

7 cliff, and while he was rolling down the hill, victim was shot at by the crime partner . . . rocks

8 were also rolled down towards him."  *Id.* at 296.

9    At the parole suitability hearing held on March 26, 1986, the Board again incorporated

10 into the record the facts adduced at the prior suitability hearings.  *Id.* at 307.  Petitioner once

11 again admitted that he pushed Mr. McCabe off the cliff.  *Id.* at 349.  He stated,

12     This was after England [sic] had mentioned shooting these people
      four times.  I believe it's four.  I can't, I can't swear to it, but, uh, I
13      believe that during that time when he was saying, "I'm going to
      shoot them," that they were going to get shot, because of things
14      that happened prior to that, such as pistol whipping, and saying
      that the guy's shirt would make a good target and all that.  And he
15      was the only one that was tied by himself, and I rolled him off the
      embankment, cliff.
16

17 *Id.* at 349.  When asked whether he "threw rocks after him to hit him," petitioner responded,

18 "No, sir."  *Id.* at 349-50.

19    The Board's 1986 decision included a detailed section entitled "Statement of Facts,"

20 which explained, among other things, that:

21     After tying three of the victims, the prisoner and his crime partner
      ran out of rope, so they tied James' legs with some clothing.  The
22      crime partner struck James with the gun and the prisoner pushed
      him off the cliff.  James was shot at, and the prisoner rolled rocks
23      down at him until they believed he was dead.  The prisoner
      attempted to push the others off the cliff, but failed due to the
24      manner in which they had been bound.

25 *Id.* at 1072-73.  The Board noted that "James [McCabe] suffered lacerations which required

26 stitches."  *Id.* at 1074.  In the section of the decision entitled "Parole Suitability," the 1986 Board

recited the circumstances it relied on in determining that petitioner was suitable for parole.  This section did not mention the circumstances of the offense, but it noted that "based on the information contained in the record and considered at this hearing, the panel states as required by PC § 3043 that the prisoner would not pose an unreasonable threat to public safety if released on parole."  *Id.* at 1079-80, 1081.  In the section of the decision entitled "Base Term of Confinement," in which the Board calculated petitioner's release date, the Board assigned an "aggravated and above-range" term of 16 years for the offense against Laura Goldman, who had been shot in the stomach and suffered massive bleeding; an aggravated term of 96 months for the offense against Jeremy Grainger, who had been shot in the chest and suffered significant liver and abdominal injuries; a term of 84 months for the offense against Eanswythe Leicester, because she was "harmed;" and a term of 60 months for the offense against James McCabe.  *Id.* at 1082-83.  It is in this context that, at the 1986 hearing, Presiding Board member Tong explained to petitioner that the term assigned for James McCabe was a "mitigated term," because "the victim was pushed off a cliff, but the injuries he received were lacerations that were not of a serious nature."  *Id.* at 362.  Commissioner Tong also told petitioner that his offense was "an exceptionally serious and aggravated commitment offense," but that "in mitigation, you did not shoot the victims, and you have made tremendous progress while in the institution."  *Id.* at 362-63.

The rescission hearing conducted on March 5, 1999 has been described above in the excerpt from *In re Caswell*, 92 Cal.App.4th at 1022-26.  As noted, that panel relied exclusively on the transcript of the 1986 hearing.  *See* RR at 390.  The panel did not have before it the transcripts of the 1982, 1984, or 1985 hearings, in which petitioner discussed and clarified what happened at the crime scene, including the facts with regard to Mr. McCabe.  *Id.* at 392.[11]  The

---

[11]  In response to a question by petitioner's counsel, a panel member conceded that it did not even have a copy of the 1986 transcript when it voted to reconsider petitioner's grant of parole:

panel incorporated by reference the statement of facts incorporated into the record at the 1986

hearing, which had been incorporated at all previous hearings. *Id.* at 392-93. Petitioner's

counsel noted that petitioner had conceded "from the beginning" that he pushed Mr. McCabe off

the cliff. *Id.* at 396. Petitioner's counsel asked the Board whether there was any question about

"improvidence in the actual setting of the terms for the offenses by the '86 panel," and a panel

member clarified that "that's not one of our issues today." *Id.* at 405-06. Later, a panel member

clarified that "the amount of time that was assessed by the Board was "not an issue." *Id.* at 407.

The Board concluded that petitioner's unexecuted parole date should be rescinded, reasoning in

relevant part as follows:

> All right, as to one, it says, an in depth discussion of the life crime
> was not conducted by the Panel and the prisoner clearly minimized
> his role in this horrific crime. The four victims were victimized,
> one thrown over a cliff and others shot. The Panel never mentions
> the fact that the prisoner was convicted of four counts of assault
> with a deadly weapon and four counts of attempted murder and
> four counts of robbery. Why they did not consider these
> convictions which were stayed is perplexing. If one wonders if the
> issues were properly examined, one is given further insight when
> reviewing the statements in the decision. Commissioner Tong, on
> page 62, regarding count number six, the Panel mitigated the term
> because, as Mr. Tong states, at line 3, quote, "but the injuries he
> received were not of a serious nature," end quote. One can only
> conclude that the Panel missed the point in that this prisoner acted
> alone in attempting to murder the victim by pushing him over a
> cliff. Then they pushed boulders down on him to further do harm
> to the victim. It appears to be pure luck and an act of God that the
> victims were not killed. The prisoner also apparently made sexual
> overtures to one of the nude female victims, which he minimized
> as some crude attempt to act macho, see page 9 of the 3/26/1986
> transcript. On page 63, Commissioner Tong states, in mitigation,

---

> ATTORNEY SATRIS: Can I ask a question then? At the time
> that you convened for the Progress Hearing, did you have the 1986
> transcript?
>
> PRESIDING COMMISSIONER BENTLEY: No.
>
> ATTORNEY SATRIS: No?

*Id.* at 392. The Commissioner also explained that he had only received the transcript of the 1986
hearing "a week ago." *Id.*

1   quote, "you did not shoot the victims," end quote.  The Panel
2   should have considered that this prisoner played an integral part in
    the facilitation of these crimes which resulted in numerous
3   attempts to murder the victims.

4   *Id.* at 433-34, 963.

5   ## B. Discussion

6       It is apparent from the record that the 1999 Board panel believed that the 1986 panel

7   misconstrued the gravity of petitioner's conduct.  It predicated this conclusion on the reasoning

8   of the earlier panel for the mitigated sentence it imposed for the McCabe offense.  The 1999

9   panel cites the earlier panel's discussion of the appropriate mitigated sentence as the reason for

10  concluding that the 1986 panel failed to consider or appreciate that the petitioner acted alone in

11  pushing McCabe off the cliff.[12]  In explaining this conclusion, the 1999 rescinding panel stated

12  that the 1986 Board "missed the point" that petitioner "acted alone in attempting to murder the

13  victim by pushing him over a cliff," and therefore failed to consider the gravity of the offense

14  against Mr. McCabe when it found petitioner suitable for parole.  *In re Caswell*, 93 Cal.App.4th

15  at 1027; *Caswell v. Calderon*, 363 F.3d at 839.  That conclusion does not accurately characterize

16  the analysis and unambiguous findings of 1986 panel.

17      There was no misunderstanding by the 1986 Board panel as to either the petitioner acting

18  alone or the gravity of the McCabe offense.  As quoted extensively above, the record reflects that

19  in every single suitability hearing prior to the 1986 hearing, with the exception of the 1984

20  hearing where petitioner declined to discuss the crime, petitioner explained that he acted alone in

21  pushing McCabe over the cliff.  During the 1985 hearing, this matter was discussed in depth,

22  including the reason why petitioner pushed McCabe over the cliff, how he pushed him over the

23

24      [12]  The California Court of Appeal, in turn, concluded that there was "some evidence" to
25  support the 1999 Panel's conclusion that the assignment of a lesser sentence on the McCabe
    offense because of the relatively minor nature of the victim's injuries meant the 1986 Board may
26  not have given "adequate consideration to the gravity of [petitioner's] crimes" when deciding
    whether he was suitable for parole.

1   cliff, what he thought would happen when he did so, and how far a drop it was to the lake.

2   Petitioner also explained that he tried to push all of the victims off the cliff but was physically

3   unable to accomplish this because they were all tied together.  All of these facts were specifically

4   incorporated into the record at the 1986 hearing.[13]

5          At the 1986 suitability hearing, petitioner once again stated that he pushed McCabe over

6   the cliff by himself.  The decision of the 1986 Board underscores the Board's understanding of

7   this issue.  Specifically, the decision noted that petitioner  "pushed [McCabe] off the cliff" and

8   also states that petitioner "rolled rocks down at him until they believed he was dead."  RR at

9   1072-73.[14]  There was no doubt expressed by anyone at any Board hearing that petitioner "acted

10  alone" in pushing Mr. McCabe off the cliff.  Nor was there any doubt that petitioner was a major

11  participant in these crimes.

12         Further, as noted by the California Superior Court, Commissioner Tong made his

13  remarks about Mr. McCabe's injuries in the context of assessing a sentence for each count under

14  California's "matrix" system.  This point was missed entirely by the rescinding panel.  As stated

15  by the Superior Court, Commissioner Tong's remarks about the nature of Mr. McCabe's injuries

16  were simply "evidence of the panel weighing and balancing the facts of each of the counts in

17  ////

18

19         [13]  The California Court of Appeal "point[ed] out" that "nothing in the record suggests
20  that the 1986 panel's finding concerning Caswell's criminal acts against McCabe turned on
    anything contained within the 1982 or 1985 transcripts," and that "the rescinding panel's failure
21  to obtain transcripts of the two earlier hearings poses no impediment to upholding the rescission
    based upon the granting panel's view of Caswell's participation in the McCabe offense."  92
22  Cal.App.4th at 1035 n.6.  This assertion is incorrect.  In fact, and as related above, each
    subsequent panel expressly stated that they were incorporating by reference all of the facts
23  ascertained at each previous hearing.  A review of all of the hearings was necessary in order to
    determine the bases of each subsequent panel's decision.

24         [14]  The record does not contain specific evidence that petitioner rolled rocks down on Mr.
25  McCabe.  As set forth above, several victims mentioned rocks being thrown down the cliff but
    none of the victims knew which defendant had done this.  At two of the suitability hearings,
26  petitioner stated that Englund kicked a boulder down the cliff after Mr. McCabe was pushed over
    but that he did not throw any rocks down himself.

relation to each other in assessing the sentence to be imposed."[15]  *Id.* at 873.  Indeed, a review of the 1986 decision reflects that all of the sentences imposed by the 1986 Board were based largely on the nature of the injuries suffered by each particular victim.  Commissioner Tong's remarks do not provide evidence that he did not understand, or failed to consider, that petitioner acted alone in pushing McCabe over the cliff.  Nor do his remarks imply that the sentence imposed for that count reflected a belief that the crimes against McCabe were minor or that petitioner's involvement in those crimes was insignificant.

There is no evidence that any commissioner assessed a mitigated term on the McCabe offense for these reasons.  On the contrary, the Board imposed an additional term of five years imprisonment on the count involving Mr. McCabe because of the *gravity* of that crime.  It is also noteworthy that the statement of reasons for a finding of suitability cited by the 1986 panel did not mention petitioner's participation in the McCabe offense or the relatively minor nature of McCabe's injuries in comparison to the others.  This provides further evidence that the Board did not find petitioner suitable for parole because it mistakenly believed that he had a minor or insignificant role in the crimes against Mr. McCabe.  In short, the 1986 panel's calculation of a smaller penalty for the offense against Mr. McCabe on the grounds that his injuries were relatively minor compared to the injuries of the other victims does not provide a factual underpinning for the 1999 panel's determination that the granting panel failed to adequately consider the gravity of the offense against Mr. McCabe when it found petitioner unsuitable for parole.  Indeed, the record as a whole shows directly the contrary.

Other portions of the record also reflect that all Board members understood well the gravity of the crimes committed by petitioner and Englund.  The Board's 1982 decision finding petitioner unsuitable for parole stated that "[petitioner], by his participation in the crimes,

---

[15]  Curiously, the 1999 Board did not object to or wish to address the length of any of the sentences imposed by the 1986 panel, including the sentence for the charges involving Mr. McCabe.

demonstrated a complete disregard for human life and suffering." *Id.* at 1019.  The Board's 1983 decision states that petitioner "was involved and actively participated in the robbery, kidnap, and attempted murder of four college students," that the crime was "senseless . . . unprovoked and deliberate," and that "the callousness demonstrated during the course of the assault of the victims shocks the public conscience." *Id.* at 1034.  The Board's 1984 decision states that "responsibility for survival of the victims cannot be attributed to [petitioner] in any way."[16] *Id.* at 1048.  The Board's 1985 decision states that the crime was "atrocious and heinous" and "showed no regard for human life or suffering." *Id.* at 1065-66.  These undisputed conclusions were incorporated into the record and essentially adopted by the 1986 Board.  All of the Board decisions correctly noted and manifest the clear understanding that petitioner acted alone in pushing Mr. McCabe off the cliff and that he tried to push the other victims off the cliff as well but was unable to do so.  All Board decisions concluded that petitioner fully participated in a heinous crime.  There was no misunderstanding in that regard.

Commissioner Tong, who made the remarks at the 1986 hearing highlighted by the California Court of Appeal, was a panel member at the 1984 suitability hearing as well. *Id.* at 133.  Commissioner Juaregui was a panel member at the 1983, 1984, 1985 and 1986 hearings. *Id.* at 133, 194, 301, 1023.  The language employed by the previous panels of which these two commissioners were members demonstrates that the commissioners at the 1986 hearing, and especially Commissioners Tong and Juaregui, had a full understanding of the gravity of the offenses, petitioner's participation therein, and petitioner's responsibility therefor.  There is no evidence that in 1986 Commissioners Tong and Juaregui misunderstood petitioner's participation in and culpability for these crimes.  Even utilizing the "extremely deferential standard" to review the sufficiency of the factual underpinning for the Board's 1999 decision to

---

[16] This sentiment was echoed by the California Court of Appeal when it noted that "the fact that McCabe suffered relatively minor injuries might be attributed to fortuity or an act of God, but it certainly cannot be attributed to Caswell."  92 Cal.App.4th at 1034.

rescind petitioner's grant of parole, there is no evidence whatever that the 1986 Board failed to consider, declined to consider, or missed the point, that petitioner acted alone in pushing McCabe over the cliff, and therefore failed to give adequate consideration to the gravity of petitioner's crimes when assessing whether petitioner was suitable for parole.  That basis for rescinding the decision by the 1986 board has no factual validity supported by any evidence in the record.

The 1999 Board panel apparently disagreed with the 1986 Board that petitioner was suitable for parole and believed that the Board should have found petitioner unsuitable. However, a decision to grant a parole date is not "subject to second-guessing upon review" but must be based on "some evidence" in the record.  *In re Caswell*, 92 Cal.App.4th at 1027 (quoting *In re Powell*, 45 Cal.3d at 904).  It appears to the undersigned that the 1999 panel improperly second-guessed the 1986 panel's decision to grant petitioner a parole date for reasons unrelated to the record.   Because the Board's 1999 decision to rescind petitioner's previous grant of parole was not supported by any evidence in the record, the rescission violated petitioner's right to due process.  *Caswell v. Calderon*, 363 F.3d at 839; *McQuillion*, 306 F.3d at 904.

Here, there has been an extraordinary passage of time since petitioner's 1986 grant of parole.  In light of this court's recommended disposition and that passage of time, the court recommends that respondent be directed to set a parole date that will ensure petitioner's release on parole within thirty days.  *See Pirtle*, 611 F.3d at 1025 (advising the district court on remand that it may wish to order the Board to set a parole date that would ensure the petitioner's release on parole within thirty days because of "the extraordinary passage of time" since the district court's order granting his habeas petition).

**V.  Conclusion**

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1.  Petitioner's application for a writ of habeas corpus be granted; and

////

2.  The California Board of Parole Hearings be directed to calculate a term for petitioner that will ensure petitioner's release on parole within thirty days from the date of service of any order adopting these findings and recommendations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:   September 24, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE