1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVEN H. CASWELL,

11              Petitioner,                    No. CIV S-91-1079 GEB EFB P

12       vs.

13   AREF FAKHOURY,[1]
                                               ORDER AND AMENDED
14              Respondent.                    FINDINGS AND RECOMMENDATIONS
     _____/

15

16       Petitioner is a state prisoner proceeding through counsel with this petition for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner raises a due process challenge to the

18   1999 decision by the California Board of Parole Hearings (hereinafter "Board") to rescind his

19   unexecuted 1986 grant of parole.

20       As discussed below, the United States Supreme Court has held that the only inquiry on

21   federal habeas review of a denial of parole is whether the petitioner has received "fair

22   procedures" for vindication of the liberty interest in parole given by the state.  *Swarthout v.*

23

24       [1] Previously named as respondent was Arthur Calderon.  The court now substitutes in the
     correct respondent, Aref Fakhoury, the Warden of the California Institute for Men, where
25   petitioner is presently incarcerated.  "A petitioner for habeas corpus relief must name the state
     officer having custody of him or her as the respondent to the petition."  *Stanley v. California*
26   *Supreme Court*, 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).

1  *Cooke*, 562 U.S. ___ , 131 S. Ct. 859 (2011).  In the context of a California parole hearing, a

2  petitioner receives adequate process when he/she is allowed an opportunity to be heard and a

3  statement of the reasons why parole was denied.  *Id.* (federal due process satisfied where

4  petitioners were "allowed to speak at their parole hearings and to contest the evidence against

5  them, were afforded access to their records in advance, and were notified as to the reasons why

6  parole was denied"); *see also Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 16 (1979).  For

7  the reasons that follow, applying this standard here requires that the petition for writ of habeas

8  corpus be denied.

9                     FACTUAL AND PROCEDURAL BACKGROUND

10  **I.  State Court Proceedings**

11        Caswell is serving an indeterminate life sentence with the
          possibility of parole, following his 1976 conviction of four counts
12        of kidnapping for the purpose of robbery (Pen. Code, § 209); he
          was also convicted of four counts each of first degree robbery
13        (Pen. Code, § 211), assault with a deadly weapon (Pen. Code, §
          245, subd. (a)), and attempted murder (Pen. Code, §§ 664, 187), as
14        to which prison sentences were stayed.  The Board is the executive
          agency authorized to grant parole and set release dates for
15        prisoners serving life sentences, and in certain circumstances it
          may rescind an unexecuted grant of parole.  (Pen. Code, §§ 3040,
16        3041.)

17        **A. Caswell's Offenses**

18        The 1978 appellate decision affirming Caswell's convictions
          summarizes the offenses as follows: "On the evening of May 20,
19        1976, at approximately 9:00 p.m., [the victims] college students
          Eanswythe Leicester, Jeremy Grainger, James McCabe and Laura
20        Goldman were in the vicinity of Redding, California, on a camping
          trip.  The [victims] stopped at campsite 14 of the Antlers
21        Campground to eat and go swimming.  On their way to the lake the
          [victims] met [the prisoner] Caswell and spoke with him briefly.
22        After finding that they could not reach the lake from their
          campsite, the [victims] crossed campsite 16 on their way back to
23        the car, and there talked with both [Caswell and his crime partner,
          David Englund] who were occupying that campsite.  [¶]  The
24        [victims] then returned to their car and left the campsite, and as
          they passed campsite 16 [Caswell and Englund] came out to the
25        road and waved for them to stop.  [Caswell and Englund] asked for
          a ride out of the campground, then . . . Englund pointed a gun at
26        the [victims] and ordered them out of the car.  The [victims] were

                                        2

ordered to the campsite 16 picnic benches as Englund pointed the gun at them and Caswell pushed them along, saying that Englund had 'a hole in his leg.' Caswell drove the car into the campsite. [¶] [Caswell and Englund] demanded money from the [victims]; Jeremy and Laura gave their money to [Caswell and Englund] and James went to the car with Caswell and gave his money to him. Eanswythe had left her money in her backpack in the car and she told [Caswell and Englund] she did not have money. When [Caswell and Englund] wanted more money[,] Jeremy told them they were students and did not have much. Englund struck him with the gun. [Caswell and Englund] indicated that they were going to take the car, and again stated that Englund was wounded. [¶] [Caswell and Englund] attempted to tie the [victims] at the picnic bench, but then took them through the bushes to a meadow where they were forced to lie on the ground. [Caswell and Englund] decided that the [victims] were too close to the road and might be able to shout for help, so they ordered them to get up and took them farther from the road. [Either Caswell or Englund] stated that Jeremy's political T-shirt would make a good target. The gun was fired, but no one was shot at that time. [¶] The victims were taken to a cliff and ordered to undress. Eanswythe was then tied by the ankles with Jeremy's T-shirt, and Laura and Jeremy were tied together with rope [Caswell and Englund] had brought along. [Caswell and Englund] tied Eanswythe's ankles to Laura and Jeremy using the same rope that Laura and Jeremy were tied with. While tying the victims, Caswell indicated that he wanted to take sexual advantage of one of the girls, but Englund was in a hurry and the matter was dropped. When the victims were tied [Caswell and Englund] debated whether to shoot them, Englund arguing that they should and Caswell saying they should not. [¶] After tying three of the victims [Caswell and Englund] ran out of rope, and so they tied James' [ sic] legs with some clothing. Englund struck James with the gun[,] and Caswell pushed him off the cliff. [Caswell and Englund] shot at James and rolled rocks down at him until they believed he was dead. Caswell attempted to push the others off the cliff but failed, due to the manner in which they had been bound. The following discussion then took place: 'Englund: "Okay, let's just gag them." Caswell: "Shoot them." Englund: "Okay."' Englund then shot Laura in the stomach and Jeremy in the chest. Eanswythe realized that it was her turn, and she held her hand in front of her face to prevent her glass lens from shattering into her eyes. She was struck with the gun four or six times, and two shots were fired at her, one passing by her ear and the other striking her finger. She then fell backwards. [¶] [Caswell and Englund] ran back to the car and drove off."

////

////

3

**B. Board's Grant of Parole in 1986**

Caswell became eligible for release on parole in April 1983, but was denied a parole date on four occasions between May 1982 and March 1985, due at least in part to the seriousness of his offenses and, on most of these occasions, unfavorable psychiatric evaluations.

In March 1986, Caswell again appeared before the Board for parole consideration. In addition to the summary of the offenses from the appellate decision, the 1986 panel had before it other material depicting the crimes, including transcripts of the 1982 and 1985 parole hearings. Based on this information, it appeared the appellate court had attributed the statement, "Shoot them," to Caswell due to the testimony of one of the female victims. The two male victims had testified that Caswell repeatedly disagreed with Englund's suggestion to shoot them. According to the attorney who represented both Englund and Caswell at the 1985 hearing, Englund represented that Caswell had never suggested shooting the victims.[2]

The 1986 panel found Caswell suitable for parole, based on: his minimal criminal record and lack of significant history of violent crimes; his stable social history; his participation in education programs, self-help programs, and vocational programs while in prison; his maturity and age; his parole plans, including job offers and family support; his positive institutional behavior; and favorable psychological evaluations. The panel stated: "Based on the information contained in the record and considered at this hearing, the panel states as required by [Penal Code section] 3043 that the prisoner would not pose an unreasonable threat to public safety if released on parole."

The 1986 panel calculated an aggregate term of sentence of 36 years, minus 41 months of postconviction credits, and set a parole release date in December 2006. Caswell's period of confinement was based on the four counts of kidnapping for the purpose of robbery. The panel set an aggravated term on two of these four counts, a middle term on another, and a mitigated term on the count pertaining to victim McCabe. The panel justified the mitigated term by pointing to the fact that, although Caswell pushed McCabe off a cliff and attempted to kill him, McCabe's injuries were minor. Caswell's term was later reduced, with a release date in September 2000.

---

[2] Caswell requested we take judicial notice of the first 11 pages of the transcript of the 1985 parole hearing that he inadvertently omitted from the record before the 1999 panel. We denied the request.

The Board, sitting en banc, reviewed the grant of Caswell's parole release date in August 1998.  Although this review was undertaken without a transcript of the 1986 hearing, the hearing at which a panel found the prisoner suitable for parole, the Board ordered that a parole rescission hearing be conducted to determine whether there was good cause to rescind Caswell's parole.  Three reasons were identified for ordering the parole rescission hearing: (1) the extreme seriousness of the crime; (2) Caswell's minimization of his involvement in the commitment offenses; and (3) Caswell's lack of remorse.

**C. The Board's Rescission of Parole in 1999**

At the rescission hearing in March 1999, the panel relied exclusively on the transcript of the 1986 hearing and did not receive any new evidence.  For example, the 1999 panel was not in possession of transcripts of the 1982 and 1985 hearings, which would have provided full descriptions of the crimes and Caswell's involvement, as well as Caswell's testimony on those points.

Following the hearing, the 1999 panel unanimously found good cause to rescind Caswell's parole, citing the extreme seriousness of the crimes and Caswell's minimization of his involvement.  In particular, the 1999 panel concluded that: (1) "[A]n in depth discussion of the life crime was not conducted by the [1986] Panel and the prisoner clearly minimized his role in this horrific crime"; (2) "[t]he [1986] Panel never mention[ed]" the stayed convictions; (3) the [1986] Panel's mitigation of the term for McCabe "missed the point in that the prisoner acted alone in attempting to murder the victim by pushing him over a cliff" and then with Englund "pushed boulders down on him to further do harm to the victim"; (4) Caswell minimized the "sexual overtures" he made to one of the female victims; and (5) the [1986] Panel should have found aggravation in the fact that Caswell "played an integral part in the facilitation of these crimes which resulted in numerous attempts to murder the victims" rather than finding mitigation in the fact that Caswell "did not shoot the victims."  The 1999 panel concluded, however, that Caswell displayed sufficient remorse.

The Board's appeals unit denied Caswell relief.  He then filed a petition for writ of habeas corpus in Solano County Superior Court.

**D. The Trial Court's Grant of Caswell's Habeas Corpus Petition**

On December 21, 2000, the trial court granted Caswell's petition for writ of habeas corpus and ordered the Board to reinstate Caswell's parole and parole date.  The court found: "[A] full and complete review of the record herein fails to reveal any evidence in support of the rescinding panel's conclusion that the grant of

1   parole was improvidently given for failure to consider the
    seriousness of the crime or failure to consider the petitioner's
2   minimization of his involvement in the crime."

3   The Board appealed, and the superior court granted a stay pending
    disposition of the appeal.
4

5   *In re Caswell*, 92 Cal.App.4th 1017, 1022-1026 (2001).

6       On appeal, the California Court of Appeal, in a published opinion, reversed the judgment

7   of the Superior Court and upheld the Board's 1999 decision rescinding petitioner's grant of

8   parole.  *Id.*  The appellate court explained its reasoning as follows:

9       **A. BACKGROUND**

10  The Board is vested with exclusive authority to decide whether a
    life prisoner is suitable for parole.  (Pen. Code, § 3040; Cal. Code
11  Regs., tit. 15, §§ 2265-2454; *In re Powell* (1988) 45 Cal.3d 894,
    901 [248 Cal.Rptr. 431, 755 P.2d 881] (*Powell*).)  One year before
12  the prisoner's minimum eligible release date, a panel of the Board
    meets with the inmate and normally sets a parole release date.
13  (Pen. Code, § 3041, subd. (a).)  Parole must be denied, however, if
    the panel in its discretion determines that the prisoner would pose
14  an unreasonable risk of danger to society if released, in light of the
    gravity of his current convicted offenses or the timing and gravity
15  of his current or past convicted offenses.  (Pen. Code, § 3041,
    subd. (b); Cal. Code Regs., tit. 15, §§ 2281, subd. (a), 2402.)
16
    Even after parole is granted, the Board is authorized to rescind the
17  grant of parole, if unexecuted, for good cause after a rescission
    hearing.  (*Powell, supra*, 45 Cal.3d at p. 901; Cal. Code Regs., tit.
18  15, § 2450; *see* Pen. Code, §§ 3040, 3063.)  "Cause" for rescission
    includes conduct enumerated in section 2451 of title 15 of the
19  California Code of Regulations, which at the time of Caswell's
    rescission hearing included: (1) any disciplinary conduct
20  subsequent to the grant of parole, (2) psychiatric deterioration of
    the prisoner, and (3) new information indicating parole should not
21  occur, such as an inability to meet a special condition of parole,
    information significant to the original grant of parole being
22  fraudulently withheld from the Board, or fundamental errors which
    resulted in the improvident grant of parole.  (*Powell, supra*, at p.
23  902.)[3]

24

25      [3] In 2000, Title 15, section 2451 of the California Code of Regulations was amended
    without substantive change, making the occurrence of "[f]undamental errors" a separate ground
26  for convening a rescission hearing.  Under the current version, therefore, a rescission hearing
    (and rescission itself) may be based on (1) the prisoner's disciplinary conduct; (2) his psychiatric

Cause for rescission is not restricted to those matters enumerated in California Code of Regulations, title 15, section 2451.  (*In re Johnson* (1995) 35 Cal.App.4th 160, 168 [41 Cal.Rptr.2d 449] (*Johnson*); *In re Fain* (1976) 65 Cal.App.3d 376, 393-394 [135 Cal.Rptr. 543] (*Fain*).)  Because the Board is afforded great discretion in parole decisions, "cause" includes a determination by the Board that parole was improvidently granted under the circumstances appearing at the time of the grant of parole or at a later time.  (*Powell*, *supra*, 45 Cal.3d at p. 902; *Johnson, supra*, at p. 168; *Fain, supra*, at p. 394.)  Thus, it has been held, parole may be rescinded if the granting panel failed to adequately consider the gravity of the prisoner's convictions.  (*Johnson, supra*, at pp. 168-169.)

Of course, a rescission may not be upheld merely because the Board has mouthed words that have been held to constitute "cause" for rescission.  There must also be an adequate "*factual underpinning* for the Board's determination of cause."  (*Johnson, supra*, 35 Cal.App.4th at p. 169, italics added.)  In light of the Board's broad discretion in these matters, however, we review the sufficiency of this factual underpinning using an extremely deferential standard, requiring merely "some evidence" to justify the rescinding panel's determination.  (*Powell, supra*, 45 Cal.3d at pp. 902, 904-906.)  As our Supreme Court has explained:  "A parole date, like a good time credit, is a prospective benefit that is conditioned on the inmate's continued good performance and subject to review and withdrawal for cause by the [Board].  While the board cannot rescind a parole date arbitrarily or capriciously, it does not abuse its discretion when it has some basis in fact for its decision. . . .  [T]he [Board] must strike 'a balance between the interests of the inmate and of the public.'  [Citation.]  If it is to accomplish this delicate task, it must operate with broad discretion and not be 'subject to second-guessing upon review.'  [Citation.]"  (*Powell, supra*, at p. 904; *Johnson, supra*, 35 Cal.App.4th at pp. 169-170.)

An example of the application of the "some evidence" standard was provided by our Supreme Court in *Powell*.  There, a life prisoner was granted release dates at parole consideration hearings held in 1977 and 1979.  After a subsequent counselor's report expressed doubt about the prisoner's suitability for parole, the board ordered a rescission hearing.  At the rescission hearing, the panel considered three psychological reports, all of which had been prepared after Powell had been given a release date.  Two of the reports favored the grant of parole, while one report favored the

deterioration; (3) "[f]undamental errors" during the hearing at which parole was granted; or (4) new information indicating parole should not occur.  (Cal. Code Regs., tit. 15, § 2451, subds. (a)-(d).)

rescission of parole.  (*Powell, supra*, 45 Cal.3d at pp. 898-901.)
The panel decided to rescind the prisoner's parole release date,
because (1) the report favoring rescission raised significant doubts
about the prisoner's potential for violence, convincing the panel
that he would pose a danger to others if released, and (2) the
granting panel had committed fundamental error, by failing to
consider the prisoner's prior escape attempt and gun smuggling
incident and only perfunctorily considering another escape
attempt.  (*Id.* at p. 901.)

After announcing the applicable standard of review, our Supreme
Court ruled that "some evidence" supported the first ground for
rescission (pertaining to the new psychological evaluation), since
the evaluation on which the Board premised its rescission was
based on the prisoner's complete medical and correctional history.
(*Powell, supra*, 45 Cal.3d at pp. 905-906.) The court concluded:
"In sum, while the evidence was unquestionably in conflict, the
resolution of that conflict and the weight to be given the evidence
was for the board.  [Citation.]  Since its determination had a factual
basis, the board did not abuse its discretion in rescinding Powell's
parole."  (*Id.* at p. 906.)

However, we point out that Powell did not decide whether there
was a sufficient basis in fact for the rescinding panel's second
ground for rescission – that the granting panel failed to adequately
consider the gravity of the offenses.  (*Powell, supra*, 45 Cal.3d at
p. 906, fn. 12 ["Accordingly, we need not consider the [Board's]
finding that the 1977 and 1979 panels committed fundamental
error resulting in the improvident granting of parole dates."].)
Powell therefore does not illustrate the application of the "some
evidence" standard where, as here, the basis for the rescission was
not new evidence, but a purportedly inadequate consideration of
evidence by the granting Board.

Circumstances more analogous to the matter at hand were
addressed by Division Four of this court in *Johnson, supra*, 35
Cal.App.4th 160.  There, a prisoner convicted of two first degree
murders was found suitable for parole in 1981.  The Board, sitting
en banc, later ordered a rescission hearing, due to (among other
things) a clinical evaluation warning that his potential for violence
on parole was unpredictable, a prison disciplinary action for
possession of contraband, and concerns expressed by the Governor
regarding public safety and the gravity of the prisoner's crimes.
(*Id.* at pp. 163-164.)  After the hearing, the panel decided to
rescind the prisoner's parole on two grounds, both of which were
premised on its disagreement with the granting panel's assessment
of the evidence: (1) failure to give "adequate weight" to the
clinical evaluation report, which indicated that the prisoner's
release would pose a danger to public safety; and (2) inadequate
consideration of the gravity of his crimes.  (*Id.* at pp. 167-168.)

The appellate court ruled that a granting panel's failure to adequately consider the gravity of the crimes may constitute "cause" for rescission of a prisoner's parole release date.  Turning to the sufficiency of the factual underpinning for the two grounds, the court identified "some evidence" to support the Board's decision to rescind parole because, in effect, it was not unreasonable to do so.  (*Johnson, supra,* 35 Cal.App.4th at pp. 169-170.)  The court explained: "Reasonable minds could differ as to whether the granting panel of the Board in 1981 gave adequate consideration to the gravity of Johnson's offenses.  Reasonable minds could also differ as to whether Johnson's release would pose a danger to public safety and as to whether in that regard adequate consideration was given to the clinical evaluation report . . . . Because the Board's discretion in parole matters is 'great,' "absolute," and "almost unlimited"' [citation], it is certainly broad enough to permit the Board to make the findings herein." (*Johnson, supra,* at p. 169.)

This language in *Johnson* should not be misconstrued.  *Johnson* could be read – incorrectly – to uphold the rescission of a parole release date merely because "reasonable minds could differ" as to the panel's determination of the prisoner's suitability for parole. That is, as long as there had been "some evidence" before the granting panel that could have reasonably justified a finding of unsuitability, a subsequent panel would have carte blanche to rescind the parole, decades later, for no reason other than its conclusory disagreement with the granting panel's ultimate decision, or mere political aversion to the concept of parole in general.  Notwithstanding the nearly absolute discretion of the Board, we find this interpretation of the standard untenable, and not in line with what our Supreme Court had in mind when it decided *Powell.*  Indeed, "some evidence" of unsuitability for parole would exist in virtually every parole hearing, exposing every grant of parole to a Board's subsequent change of heart or political whim.

In reviewing a rescission of parole based on the granting panel's failure to adequately consider the gravity of the offenses, the proper focus is on the findings and conclusions that were central to the original panel's ultimate decision to grant parole.  When these findings or conclusions cannot be reconciled with the evidence before the granting panel, or when the granting panel misstated facts or explicitly declined to consider information germane to the gravity of the crimes, it can fairly be said that reasonable minds could differ on whether the panel gave adequate consideration to the severity of the crimes.  In those instances, "some evidence" of the panel's failure to adequately consider the gravity of the prisoner's offense(s) would exist, thereby justifying rescission of the parole release date.  (Cf. Cal. Code Regs., tit. 15, § 2451, subd. (c) [rescission hearing (and rescission) warranted for "[f]undamental errors" by granting panel].)

9

We now proceed to review the 1999 panel's decision de novo to determine if it properly applied the *Powell* standard to the findings and conclusions that underlay the earlier decision to grant parole. (*See Powell, supra*, 45 Cal.3d at p. 905.)

## B. Evidence Supporting the 1999 Rescission of Parole

The record of the Board's actions might suggest to some readers that the 1999 panel had determined Caswell's fate before the hearing commenced.  The en banc recommendation that a rescission hearing be held – purportedly because the 1986 panel improvidently granted parole –  was made without benefit of a transcript of the 1986 hearing, and the rescinding panel did not have the 1982 and 1985 hearings' transcripts, at which the offenses and Caswell's participation were extensively discussed.  In light of Caswell's exemplary conduct throughout the period of his incarceration, one might question whether the determinations of either panel represented a predetermined conclusion in search of a justification, supported by little more than makeweight rationalizations for the rescission.  (*See generally In re Rosenkrantz* (2000) 80 Cal.App.4th 409 [95 Cal.Rptr.2d 279].)  Indeed, the statutory and administrative framework under which the Board operates invites debate over the role of political influence and public clamor in the parole review scheme.  (*See Warren, State Slams Door on Hopes for Parole Prisoners, L.A. Times* (Oct. 3, 1999) p. 1.)

Our task, however, is not to debate the predisposition of the panel or the political influences upon it, but to determine whether there is an appropriate statement of "cause" for the rescission and "some evidence" to support the 1999 panel's conclusions.  The Board's grounds for rescission, which we have reorganized slightly to clarify our discussion, were the following: (1) the granting panel did not conduct an in-depth discussion of the life crime; (2) the granting panel did not mention the stayed convictions; (3) the granting panel should have found aggravation in the fact that Caswell "played an integral part in the facilitation of these crimes which resulted in numerous attempts to murder the victims" rather than finding mitigation in the fact that Caswell "did not shoot the victims"; (4) Caswell minimized his role in the life crime and the "sexual overtures" he made to one of the female victims; and (5) the granting panel's mitigation of the term for McCabe "missed the point in that the prisoner acted alone in attempting to murder the victim by pushing him over a cliff" and then with Englund "pushed boulders down on him to further do harm to the victim."

We accept the premise, not substantially disputed by the parties, that these grounds generally fall within the rubric of inadequate consideration of the gravity of Caswell's offenses, and thus there exists a sufficient statement of "cause" for the action taken by the rescinding panel.  (*Johnson, supra*, 35 Cal.App.4th at pp.

168-169.)  We next examine the factual underpinning for each of these grounds.  As we shall explain, the first four grounds lack sufficient factual support in the record and, as such, cannot justify rescission of the parole release date.  The fifth ground, however, properly addresses a determination by the granting panel, which was so at odds with the material before the granting panel that there is a sufficient factual basis to conclude the granting panel failed to adequately consider the gravity of Caswell's offenses.

**1. 1986 Panel's Discussion of Caswell's Life Crime**

The 1986 panel's discussion of Caswell's life crime was not so lacking as to constitute evidence of the panel's failure to consider the gravity of his offenses.  The granting panel appeared familiar with the facts and began its interrogation of Caswell with questions concerning his involvement in the crimes.  Unlike the 1999 panel, the 1986 panel also had transcripts of Caswell's 1982 and 1985 parole hearings, which contained thorough descriptions of the offenses.  In addition, the 1986 panel was provided a broad array of other material, including the transcript of the sentencing hearing at which the trial court commented on the seriousness of the offenses and a life prisoner evaluation discussing the aggravating circumstances of the commitment offense.  We may presume the panel considered the evidence before it.  (Evid. Code, § 664.)[4]

In fact, the contention that the granting panel failed to sufficiently discuss Caswell's life crime appears to be derived solely from the rescinding panel's disagreement with the result of the 1986 hearing.  The rescinding panel did not support its contention with any erroneous specific factual determination by the granting panel that concerned the life crimes.  Nor did it cite to any express omission of evidence material to the earlier panel's consideration of those crimes.  Because the rescinding panel's subjective characterization of the granting panel's discussion of Caswell's life crimes fails to address any specific finding and lacks evidentiary support, it is an insufficient ground for rescinding Caswell's parole.

**2. Failure to Mention Stayed Offenses**

The 1999 panel also found that rescission was justified because the 1986 panel failed to mention Caswell's stayed offenses.  When Caswell was sentenced by the trial court, prison terms as to 12 of

---

[4]  The rescinding panel's assertion that the 1986 panel failed to adequately consider the 1982 and 1985 hearing transcripts is somewhat ironic, since the 1999 panel did not even have transcripts of Caswell's 1982 or 1985 hearings when it passed judgment on the action taken by the earlier panel.

the 16 counts were stayed pursuant to Penal Code section 654:[5] four counts each of attempted murder, first degree robbery with intent to inflict great bodily injury (including special findings that the victims suffered great bodily injury), and assault with a deadly weapon and/or by means of force likely to produce great bodily injury.

The 1986 panel's failure to recite and discuss the stayed offenses is not evidence that parole was improvidently granted.  There is no requirement that the stayed offenses be recited or independently discussed.  Although the 1986 panel was obligated to consider the facts underlying these stayed offenses, since they were intertwined with the crimes for which Caswell was imprisoned (Cal. Code Regs., tit. 15, § 2326, subd. (b)), we can find no statement by the 1986 panel, or other affirmative evidence, suggesting the panel declined to take into consideration the entirety of Caswell's actions in its discussion of the commitment offenses.  To the contrary, the 1986 panel discussed with Caswell topics such as the tying up and shooting of the victims, his suggestion of sexual contact with one of the female victims, the pushing of McCabe over a cliff and the rolling of rocks onto him, as well as more general questions concerning the prisoner's participation in "all the acts."  We conclude that rescission cannot be justified on this ground.

**3. Failure to Find Aggravation**

As a third ground for rescission, the 1999 panel declared that the granting panel should have found aggravation in Caswell's integral role in the facilitation of the crimes, which resulted in numerous attempts to murder the victims, rather than finding mitigation in the fact that Caswell did not shoot the victims.  The suggestion that the 1986 panel mitigated Caswell's crimes because he did not shoot anyone is inaccurate.  The 1986 panel did not state that it considered Caswell's actions less grave on this basis; and it did not reduce his term of confinement for that reason.  Instead, the remarks to which the 1999 panel refers appear in the closing comments of one of the 1986 panel members, as follows:  "*This was an exceptionally serious and aggravated commitment offense. In mitigation, you did not shoot the victims, and you have made tremendous progress while in the institution.*"  (Italics added.)  In context, the 1986 panel member was merely differentiating Caswell's actions from those of Englund, based on the uncontroverted fact that Caswell was not the one pulling the trigger.  The lone panel member's gratuitous comment does not

---

[5]  Section 654, subdivision (a), reads: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

provide a factual underpinning for the 1999 panel's determination that the granting panel failed to adequately consider the gravity of the commitment offenses.

**4. Caswell's Minimization of His Role in the Crimes.**

The 1999 panel also concluded rescission was appropriate because Caswell minimized his role in the crimes and his "sexual overtures" to one of the female victims.  In essence, at the 1986 hearing Caswell characterized his continuing participation in the crimes as an "inability" or "omission" in not escaping his crime partner.  He also attributed his suggestion of sexual contact with the bound, naked female victim, held at gunpoint, as "awkwardness," because he felt "uncomfortable tying those people up," he was "trying to impress [Englund]," and he "didn't want anybody to get shot."

Initially we point out that, contrary to appellant Board's implicit contention, a prisoner's refusal to admit participation in the crime on matters of conflicting evidence does not necessarily constitute unsuitability for parole or mandate rescission.  Section 2236 of title 15 of the California Code of Regulations reads: "The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. *The board shall not require an admission of guilt* to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner."  (Italics added.)[6]  Nor does appellant provide any legal authority for the proposition that a prisoner's "minimization" of his involvement in the crimes is sufficient to warrant rescission where, as here, the prisoner has acknowledged responsibility and demonstrated remorse.

At any rate, the record does not uphold the panel's finding that Caswell minimized his involvement in the commission of the offenses.  In testifying that the crimes escalated because of his "inability to control" and his "omission to do anything to counter what [Englund] wanted [him] to do," Caswell took responsibility not only for what he actually did, but also for the escalation of the crime in his failure to act.  The transcript of the 1986 proceedings reveals that Caswell repeatedly admitted full responsibility for the entirety of the incident.  When asked whether he took "full

---

[6]  This is particularly relevant to the present case.  As Caswell's attorney pointed out at the 1999 hearing, the 1999 panel was to investigate whether the granting panel duly considered certain points or improvidently granted parole based on the material before it.  Further testimony from Caswell is not relevant to whether the granting panel made an appropriate consideration of the record.  Caswell himself explained that everything was a matter of record and he had nothing new to add.

responsibility for what happened," he responded:  "Yes, sir."  He was then asked, "Everything that you did prior to and after the life crime, you accept full responsibility for?"  Caswell responded, "Yes, sir."  Notwithstanding how one may view his excuses for suggesting sexual contact with one of the female victims, Caswell prefaced his explanation with an acknowledgement of its insufficiency, stating: "And in no way, I don't want this panel to take this as a justification, because I don't believe there's any justification for my actions . . . ."  The 1999 panel's rescission order is not justified on the ground Caswell minimized his involvement in the crimes.

**5. The McCabe Offense**

Last, we turn to the two panels' views of Caswell's criminal conduct relative to victim McCabe.  The 1999 panel maintained that the granting panel misconstrued the gravity of this conduct and, as a result, improperly arrived at a mitigated term of imprisonment as to count VI, kidnapping for the purpose of robbery (Pen. Code, § 209), which identified McCabe as the victim.  In particular, the 1999 panel concluded the 1986 panel "missed the point" that Caswell acted alone in pushing McCabe off a cliff and rolling rocks down onto him, and inappropriately focused on the fact that McCabe suffered only minor injuries.  For reasons we shall explain, this ground for rescission reflects more than a mere disagreement with the ultimate determination reached by the 1986 panel.  Instead, it targets a specific conclusion of the granting panel and establishes the disparity between the conclusion and the evidence.

Before proceeding to our analysis, we dispose of a matter which, although not addressed by the parties at any length, warrants clarification.  The granting panel's mention of the minor nature of McCabe's injuries was not explicitly brought up during the Board's assessment of Caswell's suitability for parole.  Rather, discussion of McCabe's injuries, and the assignment of a mitigated term as to count VI, arose in connection with the granting panel's calculation of Caswell's release date.  The granting panel's determination of the prisoner's suitability for parole and the calculation of a release date were made at the same hearing, by the same panel members, and based on the same evidence.  The conclusion to be drawn is that the granting panel had the same evaluation of Caswell's conduct when deciding his suitability for parole as it did when calculating his release date.

The granting panel's assessment of Caswell's participation in the McCabe offense was a *specific finding*, which, in the context of the record before us, was central to its ultimate determination of the gravity of Caswell's offenses and his suitability for parole.  Furthermore, the 1999 rescinding panel pointed to a factual basis in the record for concluding the granting panel's finding was

inconsistent with the facts before it.  The evidence before the granting panel was as follows: after tying McCabe up, Caswell pushed him off a cliff and proceeded to roll rocks onto McCabe until he believed McCabe was dead.  The fact that McCabe suffered relatively minor injuries might be attributed to fortuity or an act of God, but it certainly cannot be attributed to Caswell.  On this record, reasonable minds could differ on whether the granting panel gave adequate consideration to the gravity of Caswell's crimes.  We are therefore constrained to agree there was "some evidence" this panel failed to adequately consider the gravity of Caswell's criminal acts against McCabe.[7]  This ground alone justifies rescission of Caswell's unexecuted grant of parole, and the trial court erred in ruling to the contrary.

**III. Disposition**

The judgment is reversed.

*In re Caswell*, 92 Cal.App.4th at 1026 -1035.[8]

////

////

////

////

_____

[7]  As mentioned, ante, the 1999 panel did not obtain transcripts from the 1982 and 1985 parole hearings, which were before the granting panel.  The 1999 panel sought to excuse this failure by expressing confidence in Caswell's attorney to bring to its attention salient information from these hearings.  We reject the notion that a rescinding panel might be relieved, on that basis, from obtaining readily available information that had been considered by the granting panel.  We point out, however, that nothing in the record suggests that the 1986 panel's finding concerning Caswell's criminal acts against McCabe turned on anything contained within the 1982 or 1985 transcripts.  For this reason, the rescinding panel's failure to obtain transcripts of the two earlier hearings poses no impediment to upholding the rescission based upon the granting panel's view of Caswell's participation in the McCabe offense.

[8]  In a subsequent order entitled "Order Modifying Opinion and Denying Rehearing; Supplemental Opinion upon Denial of Rehearing," Justice Stevens, who authored the published opinion, issued the following supplemental opinion:

> I would grant the petition for rehearing to consider further whether or not the granting panel's assessment of Caswell's participation in the McCabe offense was a specific finding as to Caswell's suitability for parole.

October 25, 2004 Answer, Ex. I.

Petitioner subsequently filed a Petition for Review in the California Supreme Court.  That petition was summarily denied by order dated January 15, 2002.  October 25, 2004 Answer, Ex. I.[9]

**II.  Proceedings in Federal Court**

On August 12, 1991, petitioner, proceeding in pro per, filed his petition for a writ of habeas corpus in this court, in which he raised two claims.  First, he claimed that the trial court violated his right to due process by failing to give a proper jury instruction on aiding and abetting.  Second, he claimed that the 1986 Board violated the Ex Post Facto clause when it deferred his parole release date until 2000.  By order dated April 8, 1993, petitioner's jury instruction claim was dismissed.  This disposition was affirmed by the U.S. Court of Appeals for the Ninth Circuit in an order dated July 16, 1997.  On October 20, 1997, following the ruling by the Ninth Circuit, petitioner informed this court that he intended to proceed with his claim for relief based on the Board's alleged violation of the Ex Post Facto Clause.  While the parties were engaged in discovery on that claim, and as described above, petitioner filed his habeas petition in the California Superior Court challenging the Board's 1999 decision to rescind his 2000 parole release date.

On January 15, 2002, petitioner, now proceeding through counsel, filed a motion for summary judgment on his ex post facto claim.  On February 6, 2002, petitioner filed a motion to amend his petition to add a claim that his rights to due process and equal protection were violated by the Board's 1999 rescission of his parole date.  Dckt. No. 124.

In findings and recommendations dated April 23, 2002, the previously-assigned magistrate judge recommended that petitioner's request to amend his petition be denied because the claim he sought to raise was futile.  Dckt. No. 134 at 3.  The magistrate judge also recommended that petitioner's motion for summary judgment on his ex post facto claim be

---

[9] Justices Baxter and Brown were of the opinion the petition should be granted.  Answer, Ex. I.

16

denied. *Id.*  By order dated July 30, 2002, the district judge denied petitioner's motion for

summary judgment on the grounds recommended by the magistrate judge.  He also denied the

motion to amend, but on the sole ground of unexplained undue delay between the Board's 1999

rescission of petitioner's release date and petitioner's 2002 request for leave to amend.  Dckt.

No. 136 at 9.  Judgment was entered on behalf of respondent on September 9, 2002.

Petitioner appealed the district court's decision to the Ninth Circuit Court of Appeals.  In

a published opinion, the Ninth Circuit concluded that petitioner's Ex Post Facto claim was moot

but ruled that petitioner should be granted leave to amend his habeas petition to add his due

process challenge to the Board's 1999 decision rescinding his 2000 parole release date.  *Caswell*

*v. Calderon*, 363 F.3d 832, 834 (9th Cir. 2004).  The court reasoned that petitioner's due process

claim was not futile, petitioner did not delay in requesting leave to amend, and the claim was

exhausted.  *Id.* at 839.  The court made the following comments relative to petitioner's due

process claim:

> Second, based on the current record, we cannot conclude that
> Caswell's due process claim is futile due to lack of merit.
> Rescission of a prisoner's parole does not violate due process so
> long as "some evidence supports the decision."  *McQuillion*, 306
> F.3d at 904 (quoting *Superintendent v. Hill*, 472 U.S. 445, 456,
> 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis in original)).
> That is not an exacting standard, so Caswell faces a difficult
> challenge in attempting to establish that the Board's rescission of
> his parole release date violated due process.  However, he is
> entitled to try.  In 2001, the California Court of Appeal examined
> the rescinding panel's decision to revoke Caswell's parole.  It
> began its analysis with this observation:

> > The record of the Board's actions might suggest to
> > some readers that the 1999 panel had determined
> > Caswell's fate before the hearing commenced.  The
> > en banc recommendation that a rescission hearing
> > be held-purportedly because the 1986 panel
> > improvidently granted parole-was made without
> > benefit of a transcript of the 1986 hearing, and the
> > rescinding panel did not have the 1982 and 1985
> > hearings' transcripts, at which the offenses and
> > Caswell's participation were extensively discussed.
> > In light of Caswell's exemplary conduct throughout
> > the period of his incarceration, one might question

17

whether the determinations of either panel
represented a pre-determined conclusion in search
of a justification, supported by little more than
makeweight rationalizations for the rescission.

*In re Caswell*, 92 Cal.App.4th at 1029-30, 112 Cal.Rptr.2d at 471.
The Court of Appeal proceeded to reject as constitutionally
deficient four of the five grounds the rescinding panel used to
justify its decision. *Id.* at 1030-34, 112 Cal.Rptr.2d 462, 472-475.

Even as to the one ground relied on by the rescinding panel that
the Court of Appeal did find was supported by "some evidence" –
namely, that the granting panel's conclusion was at odds with the
evidence at trial – the court noted that "reasonable minds could
differ." *Id.* at 1034, 112 Cal.Rptr.2d 462, 475.  Indeed, the Court
of Appeal may have betrayed its own doubts about that finding by
describing itself as "*constrained* to agree [with the rescinding
panel that] there was 'some evidence' [that the granting] panel
failed to adequately consider the gravity of Caswell's criminal acts
against [one of the victims]." *Id.* at 1034-35, 112 Cal.Rptr.2d 462,
475 (emphasis added).

Caswell's argument that the rescinding panel did not base its
decision on any evidence raises questions of fact that require
examination of both the granting panel's and rescinding panel's
decisions. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th
Cir.1988) (holding that district court abused its discretion in
denying leave to amend answer to include affirmative defense of
settlement; proposed amendment was not futile because it raised
"[q]uestions of fact").  Unfortunately, the rescinding panel's
written decision is not in the district court file.  This reinforces our
conclusion that Caswell's due process claim cannot be deemed
futile on its face.

*Id.*

On May 25, 2004, the previously-assigned magistrate judge ordered petitioner to file and

serve an amended petition consistent with the Ninth Circuit's opinion.  On July 26, 2004,

pursuant to that order, petitioner filed the amended petition for a writ of habeas corpus on which

this action proceeds, raising the sole claim that the Board violated his right to due process when

it rescinded his 2000 parole date.  Respondent filed an answer on October 25, 2004, and

petitioner filed a traverse on December 30, 2004.

On December 18, 2009, this court set a status conference in order to address matters

concerning supplementation of the record before the court.  A reconstructed record was received

1   and filed by the court on May 28, 2010.  On December 10, 2010, this court issued findings and

2   recommendations which recommended that the petition be granted and that the Board be directed

3   to release petitioner within thirty days unless a new parole suitability hearing was held in

4   accordance with due process of law.  Petitioner filed objections to those findings and

5   recommendations on December 23, 2010, and respondent filed objections on December 24,

6   2010.

7         On January 24, 2011, the United States Supreme Court issued its opinion in *Cooke*,

8   holding that California's parole statute did not create a protected liberty interest of which

9   California's "some evidence" requirement was a component.  By minute order dated January 25,

10   2011, Judge Frank C. Damrell, Jr., the district judge then assigned to this case, referred the

11   pending findings and recommendations back to the undersigned with directions to issue amended

12   findings and recommendations after consideration of *Cooke*'s applicability to this case.  By order

13   dated August 31, 2011, this matter was reassigned to District Judge Garland E. Burrell, Jr. for all

14   further proceedings due to the retirement of Judge Damrell.

15         On February 1, 2011, this court directed the parties to file briefing addressing the

16   applicability of *Cooke* to the instant case.  Both parties filed their responsive briefs on March 3,

17   2011.  After reviewing the *Cooke* decision and the parties' briefs, this court hereby vacates the

18   findings and recommendations issued on December 10, 2010, and issues the following new

19   findings and recommendations.  The parties will be given the opportunity to file written

20   objections to these amended findings and recommendations.

DISCUSSION

21

22   **I.  Standard of Review**

23         The parties dispute the proper standard of review in this case.  Respondent argues that

24   petitioner's claim is subject to the AEDPA and must be analyzed pursuant to the deferential

25   standard set forth therein. Oct. 25, 2004 Answer at 8-9.  Petitioner contends that the AEDPA

26   ////

1  does not apply to his claim because the claim is part of his habeas petition filed before AEDPA's

2  effective date.  Dec. 30, 2004 Traverse at 6-10.

3          The Antiterrorism and Effective Death Penalty Act provides that a writ of habeas corpus

4  may not be granted with respect to any claim that was adjudicated on the merits in state court

5  unless the state court's adjudication of the claim:

6          (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
7          determined by the Supreme Court of the United States; or

8          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
9          State court proceeding.

10  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

11  *Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).  An

12  application for a writ of habeas corpus filed after April 24, 1996, the effective date of AEDPA, is

13  governed by the AEDPA standards of review.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997);

14  *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003), *overruled on other grounds* by *Lockyer v.*

15  *Andrade*, 538 U.S. 63 (2003).  An application filed before the effective date of AEDPA is not

16  subject to the AEDPA standard of review and must be reviewed by pre-AEDPA standards.  *Id.*

17          Petitioner filed his original habeas petition in this court in 1991, prior to the enactment of

18  AEDPA.  In 2002, subsequent to the enactment of the AEDPA, petitioner sought to amend his

19  1991 petition to add his due process challenge to the rescission of his parole date.  Dckt. No.

20  124.  That request was ultimately granted by the Ninth Circuit Court of Appeals, and petitioner

21  filed an amended petition on July 26, 2004.  Because petitioner filed his original petition prior to

22  the effective date of AEDPA, substantive review of the 2004 amended petition is governed by

23  pre-AEDPA standards and precedent.  *Lindh*, 521 U.S. at 327.  An amended petition filed after

24  AEDPA's effective date is not subject to AEDPA's standards of review as long as the

25  amendment is part of a case that was pending at the time AEDPA was enacted.  *See, e.g., Smith*

26  *v. Mahoney*, 611 F.3d 978, 994-95 (9th Cir. 2010) (an amended petition filed after AEDPA was

20

1    enacted containing new claims is not subject to AEDPA's statute of limitations as long as the

2    amendment is part of a case pending at the time AEDPA was enacted); *Allen v. Roe*, 305 F.3d

3    1046, 1049-50 (9th Cir. 2002) (holding that because petitioner filed his original habeas petition

4    before the enactment of AEDPA, his amended petition filed after AEDPA's effective date was

5    governed by pre-AEDPA law); *Mancuso v. Olivarez*, 292 F.3d 939, 949 (9th Cir. 2002) (holding

6    under *Lindh* that review of amended petition filed after AEDPA's effective date was governed

7    by pre-AEDPA standards and precedent because Mancuso filed his petition prior to the effective

8    date of AEDPA); *Anthony v. Cambra*, 236 F.3d 568, 576-77 (9th Cir. 2000) (same).

9    Accordingly, this court will evaluate the merits of petitioner's due process claim under

10   pre-AEDPA standards.

11   **II.  Petitioner's Due Process Claim**

12           Petitioner claims that the Board's rescission of the 1986 finding that he was suitable for

13   parole and the consequent elimination of his parole release date was "arbitrary and capricious"

14   and "without cause or sufficient evidence," and therefore violated his federal right to due

15   process.  Am. Pet. at 3, 5.  He argues that "[n]o reasonable comparison of the granting panel's

16   decision and the rescinding panel's decision can support a determination that there was some

17   evidence that the granting panel had not fully considered and weighed the circumstances of the

18   crime, including the circumstances relating to the McCabe offense that the rescinding panel

19   relied on and that the California Court of Appeal focused on as the basis for reversing the grant

20   of habeas corpus."  *Id.* at 3-4.  Petitioner requests that this court "direct the Department of

21   Corrections to reinstate his parole suitability finding, and to release petitioner on parole

22   forthwith."  *Id.* at 6.

23           **A.  Due Process Standards in Parole Proceedings**

24           The Due Process Clause of the Fourteenth Amendment prohibits state action that

25   deprives a person of life, liberty, or property without due process of law.  A litigant alleging a

26   due process violation must first demonstrate that he was deprived of a liberty or property interest

protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or from "an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). *See also Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981); *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 7 (1979) (There is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *see also Hayward v. Marshall*, 603 F.3d 546, 561 (9th Cir. 2010) (en banc). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." *Greenholtz*, 442 U.S. at 12). *See also Allen*, 482 U.S. at 376-78.

California's parole scheme[10] gives rise to a liberty interest in parole protected by the federal due process clause. *McQuillion v. Duncan*, 306 F.3d 895, 902-03 (9th Cir. 2002) ("California's parole scheme gives rise to a cognizable liberty interest in release on parole."); *see Cooke*, 131 S.Ct. at 861-62 (stating that the Ninth Circuit's determination that California's parole law creates a liberty interest protected by the federal due process clause "is a reasonable application of our cases."). However, the United States Supreme Court has held that correct application of California's "some evidence" standard is not required by the federal Due Process

---

[10] In California, a prisoner is entitled to release on parole unless there is "some evidence" of his or her current dangerousness. *In re Lawrence*, 44 Cal.4th 1181, 1205-06, 1210 (2008); *In re Rosenkrantz*, 29 Cal.4th 616, 651-53 (2002).

1   Clause.  *Cooke*,131 S.Ct. at 861.  Rather, this court's review is limited to the narrow question of

2   whether the petitioner has received adequate process for seeking parole.  *Id.* at 862.  ("Because

3   the only federal right at issue is procedural, the relevant inquiry is what process [petitioner]

4   received, not whether the state court decided the case correctly.")  Adequate process is provided

5   when the inmate is allowed a meaningful opportunity to be heard and a statement of the reasons

6   why parole was denied.  *Id.* at 862-63 (federal due process satisfied where petitioners were

7   "allowed to speak at their parole hearings and to contest the evidence against them, were

8   afforded access to their records in advance, and were notified as to the reasons why parole was

9   denied"); *see also Greenholtz*, 442 U.S. at 16.

10      **B. Analysis**

11          In *Cooke*, the United States Supreme Court applied the procedural protections set forth in

12   *Greenholtz* to determine whether the petitioner had received adequate due process in the context

13   of a parole suitability hearing.  The court held that where the liberty interest at stake was the

14   interest in receiving parole when the California standards for parole had been met, "the minimum

15   procedures adequate for due-process protection of that interest are those set forth in *Greenholtz*."

16   131 S.Ct. at 862.  As explained above, *Greenholtz* limits those procedures to a meaningful

17   opportunity to be heard and a statement of the reasons why parole was denied.  In the instant

18   case, petitioner is challenging a parole rescission hearing, not a parole suitability hearing.

19   Petitioner argues that the greater procedural protections afforded to the revocation of good-time

20   credits should apply to parole rescission proceedings, and not the minimal procedures for parole

21   suitability hearings set forth in *Greenholtz*.  Dckt. 186 at 2.  Specifically, he contends that this

22   court should apply the federal due process protections articulated in *Superintendent, Mass.*

23   *Correctional Institution at Walpole v. Hill*, 472 U.S. 445 (1985).  *Id.*

24          In *Hill*, the United States Supreme Court held that, to comply with due process,

25   revocation of a prisoner's good time credits must be supported by "some evidence."  472 U.S. at

26   455.  Petitioner argues that the same test should be employed here.  He points out that the

23

petitioner in *Cooke* had never been granted a parole date, whereas he was found suitable for

parole in 1986 and was given a date for parole release in 1999.  Dckt. 186 at 2.  Petitioner notes

that, whereas the petitioner in *Hill* had lost 100 days of good time credits based on a disciplinary

conviction, the parole board's decision to rescind his parole has extended his length of

imprisonment to more than eleven years "and counting."  *Id.* at 2-3.  Petitioner argues that if the

100 days of extra incarceration imposed on the petitioners in *Hill* was sufficient to trigger a

federal constitutional right to "some evidence" review of the rescission decision, "the 4015 days

of extra incarceration imposed on petitioner Caswell makes him about 40 times deserving of

federal constitutional 'some evidence' review from this Court."  *Id.* at 3-4.

Petitioner's argument in this regard has some merit.  In *McQuillion*, the Ninth Circuit

explicitly held that the federal due process standard announced by the Supreme Court in *Hill*

applied to a challenge to a parole rescission hearing.  306 F.3d at 906 ("like the *Caswell* court,

we must apply the federal due process standard announced by the Supreme Court in *Hill*.").

However, the United States Supreme Court's subsequent holding in *Cooke* appears to encompass

not just parole consideration hearings, but the entire parole process in California.  *See* 131 S.Ct.

at 863 ("The short of the matter is that the responsibility for assuring that the constitutionally

adequate procedures governing California's *parole system* are properly applied rests with

California courts, and is no part of the Ninth Circuit's business.") (emphasis added).

Accordingly, previous rulings applying a different standard of due process protection to the

parole process in California appear to be no longer applicable.

A federal habeas court reviewing a state parole claim is limited to deciding only whether

the procedural safeguards set forth in *Greenholtz* were satisfied.  *Cooke*, 131 S.Ct. at 862-63.

"In the context of parole . . . the procedures required are minimal" and are determined by federal

law, not state law.  *Id.* at 862 & n.*  In her concurring opinion in *Cooke*, Justice Ginsburg opined

that the "some evidence" requirement set forth in *Hill* was not required in the parole suitability

context presented in that case because the Ninth Circuit had determined that, for California's

24

1   "parole system," *Greenholtz* is the controlling precedent.  *Id.*  Similarly, in *Hayward v. Marshall*,

2   603 F.3d 546, 559-61 (2010) (en banc), *overruled sub silentio in part* by *Cooke*, 131 S.Ct. 859,

3   the Ninth Circuit held that *Hill* is not the controlling precedent in parole proceedings, noting that

4   "*Hill* addresses good time, not parole."  These authorities undermine petitioner's argument that

5   *Hill* provides the procedural protections required in the context presented in this case.

6           Petitioner's essential claim is that California's "some evidence" standard was incorrectly

7   applied in his parole rescission hearing.  It is this type of challenge to the application of

8   California's parole system that the court in *Cooke* disapproved.  In light of *Cooke*'s broad

9   holding, which appears to be directed to the parole process in California as a whole, this court

10  will apply the standards announced in *Cooke* here.[11]

11          The record reflects that petitioner was present at his 1996 rescission hearing, that he

12  participated in the hearing, and that he was provided with the reasons for the Board's decision to

13  rescind his parole.  Pursuant to *Cooke*, this is all that due process requires.  Accordingly,

14  petitioner is not entitled to relief on his due process claim.  *See Clutchette v. Adams*, No. 1:09-

15  cv-02008-OWW-SKO-HC, 2011 WL 444868 (E.D. Cal. Feb. 8, 2011) (dismissing habeas

16  petition challenging en banc parole decision which disapproved a hearing panel's earlier finding

17  that petitioner was suitable for parole, citing *Cooke*).

18  ////

19  ////

20

21          [11]  The court notes in this regard that pursuant to the California Constitution and the

22  California Penal Code, during the 30 days following the granting, denial, revocation, or
    suspension of parole by the Board, the California Governor may review the Board's decision and

23  may affirm, modify, or reverse that decision based on the same facts that were before the Board,
    on the basis of the same factors which the parole authority is required to consider.  Article V,

24  Section 8 of the California Constitution; California Penal Code § 3041.2.  This process appears
    to be nearly identical to the power of the Board to rescind a previously granted parole date.  The

25  United States Supreme Court held in *Cooke* that *Greenholtz* provides the applicable procedural
    protections in connection with the Governor's rescission of a previous Board finding of parole

26  suitability.  131 S.Ct. at 863 n.* This holding supports this court's conclusion that the procedural
    protections set forth in *Greenholtz* also apply to a parole rescission by the Board.

CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.  Aref Fakhoury is substituted as the proper respondent in this matter; and

2.  The December 10, 2010 findings and recommendations are vacated.

Further, it is hereby RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

In any objections he elects to file, petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant); *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc) (prisoners are required to obtain a certificate of appealability to review the denial of a habeas petition challenging an administrative decision such as the denial of parole by the parole board).

DATED:  April 5, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE